**FILED**

Jun 25 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ joanag          DEPUTY

1   ALDEN F. ABBOTT
General Counsel
2
3   SAMANTHA GORDON (IL Bar No. 6272135)
sgordon@ftc.gov
4   MATTHEW H. WERNZ (IL Bar No. 6294061)
mwernz@ftc.gov
5
Federal Trade Commission
6   230 South Dearborn, Suite 3030
7   Chicago, Illinois 60604
312.960.5623 (Gordon)
8   312.960.5596 (Wernz)
9   ATTORNEYS FOR PLAINTIFF

10
11
**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

12
13   | FEDERAL TRADE COMMISSION, | Case No.: [Case No.] **'18 CV 1388 BEN NLS** |

14   Plaintiff,   Memorandum of Points and
Authorities in Support of Plaintiff's *Ex*
15   v.   *Parte* Motion for Temporary
Restraining Order with Asset Freeze,
16   TRIANGLE MEDIA   Appointment of a Receiver, Other
17   CORPORATION, a Delaware   Equitable Relief, and Order to Show
corporation, also doing business as   Cause Why a Preliminary Injunction
18   Triangle CRM, Phenom Health, Beauty   Should Not Issue
19   and Truth, and E-Cigs, *et al.*,
20   Defendants.

21
22
23
24
25
26
27
28

i

# TABLE OF CONTENTS

I.      Introduction..................................................................................................1

II.     Defendants' Illegal Business Practices.........................................................4

        A.      Defendants' Deceptive Trial Offers .......................................................4

        B.      Defendants' Deceptive Order Completion Pages ...............................13

        C.      Defendants' Restrictive Cancellation and Refund Practices .............17

III.    Defendants ................................................................................................19

IV.     Argument ...................................................................................................21

        A.      This Court Has the Power to Grant the Requested Relief..................22

        B.      The FTC Meets the Standard for Issuance of a Temporary Restraining
                Order..........................................................................................................23

                1.      The FTC is Likely to Succeed on the Merits...........................23

                        a.      Defendants Are Violating the FTC Act...........................24

                                i.      Defendants' Practices Are Deceptive Under the
                                        FTC Act...............................................................24

                                ii.     Defendants Also Violate the FTC Act by Unfairly
                                        Billing Consumers Without Authorization ..........26

                        b.      Defendants' Undisclosed, Unauthorized Charges Violate
                                ROSCA .......................................................................28

c.      Defendants' Unauthorized Debits also Violate the
        Electronic Fund Transfer Act and Regulation E ............30

2.    The Balance of Equities Strongly Favors Injunctive Relief .....31

3.    Defendant Phillips is Individually Liable for Defendants'
      Practices ......................................................................................32

C.    The Scope of the Proposed Temporary Restraining Order is Necessary
      and Appropriate .................................................................................33

D.    The Temporary Restraining Order Should be Issued *Ex Parte* to
      Preserve the Court's Ability to Fashion Meaningful Relief ...............35

V.    Conclusion .................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*Barrer v. Chase Bank United States, N.A.*, 566 F.3d 883 (9th Cir. 2009)...............29

*Delaware Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964) ....................................20

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)..................23, 31, 32

*FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) ............................34

*FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 U.S. Dist. LEXIS 55569

     (W.D. Wash. April 26, 2016) ...............................................................27, 28

*FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564 (7th Cir. 1989) ..................................32

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) .........................24, 25

*FTC v. DiscountMetalBrokers, Inc.*, No. 2:16-cv-2112-ODW(JC), 2017 U.S. Dist.

LEXIS 164878, (Oct. 4, 2017)...................................................................33

*FTC v. Five-Star Audio Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ..............25

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996).......................................34

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001)..............................................................24

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982)..................................22, 34

*FTC v. Health Formulas, LLC*, No. 2:14-cv-01649, 2015 U.S. Dist. LEXIS 59387

     (D. Nev. May 6, 2015).........................................................................29, 30

*FTC v. Ideal Fin. Sols.*, No: 2:13-cv-00143-JAD-GWF, 2015 U.S. Dist. LEXIS

     86348 (D. Nev. June 29, 2015)...................................................................27

*FTC v. Inc21.com*, 745 F. Supp. 2d 975 (N.D. Cal. 2010)......................................28

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000)....................20, 21

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052

    (C.D. Cal. 2013)..............................................................................................20

*FTC v. Mortg. Relief Advocates*, No. CV-14-5434-MWF (AGRx), 2015 U.S. Dist.

    LEXIS 18609 (C.D. Cal. July 1, 2015) .........................................................33

*FTC v. Neovi*, 604 F.3d 1150 (9th Cir. 2010).....................................................26, 27

*FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008) *aff'd*, 604 F.3d

    1150 (9th Cir. 2010) ................................................................................27, 28

*FTC v. Pantron I Corp.*, 33 F. 3d 1088 (9th Cir. 1994) ...................................22, 24

*FTC v. Publ'g Clearing House*, 104 F.3d 1168 (9th Cir. 1997)..............................33

*FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) ...........................................32

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993 (N.D. Ind. 2000), *aff'd* 312

    F.3d 259 (7th Cir. 2002) ...............................................................................20

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) ..............................35

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984)..............................23

*FTC v. Windward Mktg.*, No. 1:96-CV-615F, 1997 U.S. Dist. LEXIS 17114 (N.D.

    Ga. Sep. 30, 1997) .........................................................................................27

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989)..........23, 31, 32, 34

*In re Cliffdale Assocs.*, 103 F.T.C. 110 (1984).......................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In the Matter of McGaughey*, 24 F.3d 904 (7th Cir. 1994) .....................................35

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)......................................................25

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ...............36

*SEC v. First Fin. Group*, 645 F.2d 429 (5th Cir. 1981)...........................................35

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)...........................34

**Court Orders**

*FTC v. A1 DocPrep Inc.*, CV-17-07044 (C.D. Cal. Sept. 28, 2017)......................22

*FTC v. Alliance Document Prep.*, CV-17-7048 (C.D. Cal. Sept. 28, 2017) ...........22

*FTC v. BAM Fin., LLC*, SACV15-01672 (C.D. Cal. Oct. 21, 2015)......................23

*FTC v. Bunzai Media Group, Inc.*, No. CV15-C4527-GW (PLAx) (C.D. Cal. June 15, 2015) .........................................................................................................23

*FTC v. Good Ebusiness, LLC*, CV-16-1048-ODW (C.D. Cal. Feb. 16, 2016) .......22

*FTC v. Grant Connect, LLC*, No. 09-01349 (D. Nev. July 28, 2009)....................23

*FTC v. Health Formulas, LLC*, No. 2:14-cv-01649 (D. Nev. Oct. 9, 2014)...........23

*FTC v. M&T Fin. Group*, CV-17-6855 (C.D. Cal. Sept. 19, 2017) ........................22

*FTC v. Membership Servs., Inc.*, 01-cv1868 (S.D. Cal. Oct. 17, 2001).................22

*FTC v. National Art Pubs. & Distribs., Inc.*, CV-94-0518 (S.D. Cal. Apr. 5, 1994)..........................................................................................22

*FTC v. Pac. Med. Clinics*, CV-90-1277 (S.D. Cal. Sept. 19, 1990).......................22

*FTC v. Properties Int'l*, CV-90-756 (S.D. Cal. June 6, 1990) ...............................22

*FTC v. RevMountain, LLC*, 17-cv-02000-APG-GWF (D. Nev. July 24, 2017) .....23

*FTC v. Sale Slash, LLC*, SACV15-3107 (C.D. Cal. Apr. 27, 2015) .......................23

*FTC v. Telestar Consulting, Inc.*, CV-16-555-SJO (SSx)

    (C.D. Cal. Feb. 1, 2016) ................................................................................23

*FTC v. Wealth Educators, LLC*, SACV15-2357 (C.D. Cal. Apr. 6, 2015) .............23

**<u>Statutes, Regulations, and Rules</u>**

12 C.F.R. § 205.10(b) .......................................................................30, 31

12 C.F.R. § 1005.10(b) .............................................................................21

15 U.S.C. § 45(a) ...............................................................................21, 24

15 U.S.C. § 53(b) ..............................................................................22, 34

15 U.S.C. § 1693e(a).........................................................................21, 31

15 U.S.C. § 1693l................................................................................31

15 U.S.C. § 8403 ...............................................................................21, 28

Fed. R. Civ. P. 65(b) ...............................................................................36

**<u>Other</u>**

*Consumer Financial Protection Board's Official Staff Commentary to Regulation E*, 12 C.F.R. Part 205, Supp. I, ¶ 10(b), comments (5) & (6)..................................31

*FTC Policy Statement on Deception*, 103 F.T.C. 175 (1983).................................25

viii

## I.   Introduction

The Federal Trade Commission asks this Court to halt an online marketing scheme that deceptively promotes "risk-free" trial offers to dupe unsuspecting consumers into enrolling in costly continuity plans for Defendants' skin care products, electronic cigarettes, and dietary supplements.  Although consumers authorize the payment of only a nominal shipping and handling charge, Defendants instead charge them up to $200 each month for regular shipments of products they did not order or want.  Defendants have reaped more than $30 million from these unlawful marketing practices, which violate the Federal Trade Commission Act (the "FTC Act"), the Restore Online Shoppers' Confidence Act ("ROSCA"), the Electronic Fund Transfer Act ("EFTA"), and Regulation E.

Defendants market their "risk free" trials on a series of nearly identical websites, representing that consumers must pay only a minimal shipping and handling fee (typically $4.95) to receive the one-month trial.  In ordering the trial, consumers are asked to provide their credit or debit card information, purportedly to pay the shipping and handling fee.  Defendants represent that the product itself does not cost anything and, further, that the shipping and handling fee represents the "Total" cost of the trial.  Thus, consumers who order one of Defendants' trials understand that they will receive a single shipment of one product and will be charged just a single, nominal shipping and handling fee.

However, a short time later, Defendants charge consumers the full price of the "trial" product, up to $98.71.  Defendants also enroll consumers in a continuity plan, under which consumers receive additional shipments of the product each month and are charged the full price of those products.  Thus, consumers who authorized only a one-time charge of $4.95 end up paying an additional $98.71 the first month, and then a similar amount in subsequent months until the consumer is able to cancel.

To make matters worse, Defendants then deceive consumers into ordering a trial of a second product by misrepresenting on subsequent pages of their websites that the consumer's order of the first trial product is not yet complete.  When consumers click the box that purportedly will complete their order, however, they are signed up for an additional "trial" (for which they will ultimately pay full price) and yet another monthly continuity plan.

In sum, the "risk free" trial for which the consumer authorized only a $4.95 charge often results in charges of more than $200 in the first month alone.  Even consumers who discover these unauthorized charges and seek refunds often find that they are unable to get their money back because of Defendants' restrictive refund policies.  Not surprisingly, consumers have filed hundreds of complaints about Defendants' practices with the Better Business Bureau.

Attempting to evade detection by law enforcement, Defendants use an ever-changing network of websites and shell entities to operate their scheme. Defendants establish payment processing accounts in the shell entities' names, which are used to collect the unauthorized charges. The unauthorized charges are then transferred from the shell entitites to Defendants, who in turn regularly send the bulk of the proceeds out of the country.

Plaintiff's evidence of Defendants' illegal practices is overwhelming. It includes screenshots of Defendants' deceptive advertisements, emails, and websites; third-party records showing the structure of Defendants' enterprise; sworn statements from 9 victimized consumers and complaints from hundreds of others; and a sworn declaration from an FTC investigator.

The FTC brings its motion for a temporary restraining order ("TRO") *ex parte* to bring a halt to Defendants' illegal practices, to freeze their assets, and to have a temporary receiver appointed over the business. Defendants' widespread pattern of deception, unauthorized charges to consumers' accounts, offshore transfers of assets, use of shell companies to disguise their identity, and other efforts to evade responsibility for their conduct all strongly suggest that they would hide or dissipate assets if they received notice of this action. The requested relief is necessary and appropriate to preserve the Court's ability to provide effective final relief, including eventual restitution to the victims.

## II.     Defendants' Illegal Business Practices[1]

Defendants entire business model is based upon deception.  Defendants lure consumers into providing their billing information with false promises of a "risk free" trial for which consumers purportedly will pay only a nominal shipping and handling fee.  But Defendants fail to disclose that the consumer's account will ultimately be charged the full price for the product not once, but monthly until the consumer cancels.  In this way, Defendants essentially have stolen more than $30 million from consumers.

### A.     Defendants' Deceptive Trial Offers

Defendants advertise through banner ads, emails, blog posts, Facebook advertising, and pop-up "customer satisfaction" surveys,[2] offering consumers a

---

[1]     The FTC has filed an Appendix of Declarations in Support of Plaintiff's *Ex Parte* Motion for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Appx.").

"risk free" trial of one of their products.[3]  These advertisements claim that

consumers can receive the trial for just the cost of shipping and handling, typically

$4.95.[4]

Consumers who click on these advertisements are taken to Defendants'

websites.[5]  There, Defendants prominently offer a "RISK FREE" trial of the

---

[2]     Declaration of Douglas M. McKenney ("McKenney Dec."), Plaintiff's Exhibit ("PX") 10, Appx. at 165, ¶ 10 & Attachment ("Att.") H, at 260-64; Appx. at 175, ¶ 37 & Att. I, at 304; Appx. at 183, ¶ 62 & Att. J, at 325-26; Appx. at 189, ¶ 79 & Att. K, at 353; Appx. at 197, ¶ 102 & Att. M, at 382-94; Appx. at 200, ¶¶ 108 and 109 & Att. N, at 404-22; Appx. at 202, ¶¶ 114 - 116 & Att. O, at 439-62; Appx. at 204, ¶¶ 122 and 123 & Att. P, at 487-496; Declaration of Jennifer Clark ("Clark Dec."), PX 1, Appx. at 4, ¶ 2; Declaration of Theresa Fabbricante ("Fabbricante Dec."), PX 2, Appx. at 22, ¶ 2; Declaration of Susan Landreau ("Landreau Dec."), PX 3, Appx. at 30, ¶ 2; Declaration of Nancy Lawhorn ("Lawhorn Dec."), PX 4, Appx. at 64, ¶ 2; Declaration of Larry Mack ("Mack Dec."), PX 5, Appx. at 86, ¶ 2;  Declaration of Jerry McCallum ("McCallum Dec."), PX 6, Appx. at 96, ¶ 2;Declaration of Janet Pollard ("Pollard Dec."), PX 7, Appx. at 113-14, ¶¶ 2-7; Declaration of Shawn Ulmer ("Ulmer Dec."), PX 8, Appx. at 136, ¶ 2; Declaration of John McCraner ("McCraner Dec."), PX 9, Appx. at 147, ¶ 2.

[3]     The products Defendants market in this way include skin care products (e.g., "Erase Repair H/A" and "Wrinkle Rewind"), electronic cigarettes (e.g., "Pro Vapor"), and dietary supplements (e.g., "Cerebral X," "TestXCore," and "Garcinia Clean XT").

[4]     McKenney Dec., PX 10, Appx. at 183, ¶ 62 & Att. J, at 325-26; Appx. at 200, ¶¶ 108 and 109 & Att. N, at 404-22; Appx. at 202, ¶¶ 114 - 116 & Att. O, at 439-62; Appx. at 204, ¶¶ 122 and 123 & Att. P, at 487-496; Clark Dec., PX 1, Appx. at 4, ¶ 3; Fabbricante Dec., PX 2, Appx. at 22, ¶ 2; Landreau Dec., PX 3, Appx. at 30, ¶ 2; Lawhorn Dec., PX 4, Appx. at 64, ¶ 2; Mack Dec., PX 5, Appx. at 86, ¶ 2; McCallum Dec., PX 6, Appx. at 96, ¶ 2; Pollard Dec., PX 7, Appx. at 114, ¶ 6; Ulmer Dec., PX 8, Appx. at 136, ¶ 2; McCraner Dec., PX 9, Appx. at 147, ¶ 3.

Cosmopolitan suggesting that these products have been featured on those outlets and in those magazines.[8]

For example, the screen shot below depicts Defendants' website for "Cerebral X," offering a "risk-free" trial but indicating that consumers should "HURRY!" because "there is a limited supply."



Consumers who are interested in receiving the trial are then asked to provide their name, address, telephone number, and email address, as shown in the screenshot below:[9]

---

[8]    McKenny Dec., PX 10, Appx. at 166-67, ¶ 15 & Att. H, at 265; Appx. at 200-01, ¶110 & Att. N, at 423-31; Appx. at 203, ¶ 117 & Att. O, at 463-64; Appx. at 205-06, ¶ 125 & Att. P, at 497.



Once consumers enter their personal information and click "Get My Risk Free Trial," they are directed to Defendants' payment page. This page requests consumers' debit or credit card information to cover the nominal shipping and

---

[9]   McKenney Dec., PX 10, Appx. at 166-67, ¶ 15 & Att. H, at 265-67; Appx. at 176, ¶ 39 & Att. I, at 305-311; Appx. at 184, ¶ 64 & Att. J, at 327-30; Appx. at 189-90, ¶ 81 & Att. K, 357-59; Appx. at 198-99, ¶ 104 & Att. M, at 395-98; Appx. at 200-01, ¶ 110 & Att. N, at 423-32; Appx. at 203, ¶ 117 & Att. O, at 463-480; Appx. at 205-06, ¶ 125 & Att. P, at 497-503.; Clark Dec., PX 1, Appx. 4, ¶ 4.

handling charge, in this example a charge of $4.95.[10] Significantly, the payment page prominently states that the "Total" cost is just $4.95.[11]



---

[10]     McKenney Dec., PX 10, Appx. at 167, ¶ 16 & Att. H 278-79; Appx. at 176-77, ¶ 40 & Att. I, at 312; Appx. at 184, ¶ 65 & Att. J, at 334, 190-91, ¶ 82 & Att. K, at 360; Appx. at 196, ¶ 100 & Att. L, at 380; Appx. at 199, ¶ 105 & Att. M, at 401-02; Appx. at 201-02, ¶ 111 & Att. N, at 433-37; Appx. at 204, ¶ 119 & Att. O, at 483-485; Appx. at 206, ¶ 126 & Att. P, at 507-08; Clark Dec., PX 1, Appx. at 4, ¶ 5; Fabbricante Dec., PX 2, Appx. at 22, ¶ 2; Landreau Dec., PX 3, Appx. at 30, ¶ 3; Lawhorn Dec., PX 4, Appx. at 64, ¶ 3; Mack Dec., PX 5, Appx. at 86, ¶ 3; Pollard Dec., PX 7, Appx. at 114, ¶ 6; Ulmer Dec., PX 8, Appx. at 136, ¶ 2.

[11]     *Id.*; Clark Dec., PX 1, Appx. at 4, ¶ 5.

Unfortunately, consumers who enter their billing information and click

"GET MY RISK FREE TRIAL" on this page do not merely receive a one-month

supply for just the shipping cost of $4.95.[12] Instead, approximately 15 days later,

Defendants charge consumers the full price of the trial product – which ranges

from $84.71 to as much as $98.71.[13] Defendants also enroll consumers in a

continuity program,[14] under which Defendants send consumers additional

---

[12]    Unless they uncheck a pre-checked box appearing under the bright yellow
"Total" on the payments screen, consumers also will be charged an additional
$2.95 for something called "Protect Package," which purports to provide shipping
insurance. McKenney Dec., PX 10, Appx. at 167, ¶ 16 & Att. H, at 278-279;
Appx. at 176-77, ¶ 40 & Att. I, at 312; Appx. at 184-85, ¶ 65 & Att. J, at 334;
Appx. at 190-91, ¶ 82 & Att. K, at 360; Appx. at 196-97, ¶ 100 & Att. L, at 379-
80; Appx. at 199, ¶ 105 & Att. M, at 401-02; Appx. at 201-02, ¶ 111 & Att. N, at
435-37; Appx. at 204, ¶ 119 & Att. O, at 483-85; Appx. at 206, ¶ 126 & Att. P at
507-08; Landreau Dec., PX 3, Appx. at 32-33, ¶¶ 13, 15; Ulmer Dec., PX 8, Appx.
at 136, ¶ 2.

[13]    McKenney Dec., PX 10, Appx. at 167, ¶ 16 & Att. H, at 278-279; Appx. at
176-77, ¶ 40 & Att. I, at 312; Appx. at 180, ¶ 53; Appx. at 184-85, ¶ 65 & Att. J, at
334; Appx. at 190-91, ¶ 82 & Att. K, at 360; Appx. at 196-97, ¶ 100 & Att. L, at
379-80; Appx. at 199, ¶ 105 & Att. M, at 401-02; Appx. at 201-02, ¶ 111 & Att. N,
at 435-37; Appx. at 204, ¶ 119 & Att. O, at 483-85; Appx. at 206, ¶ 126 & Att. P at
507-08; Clark Dec., PX 1, Appx. at 5, ¶ 7; Fabbricante Dec., PX 2, Appx. at 22,
¶ 5; Landreau Dec., PX 3, Appx. at 31, ¶ 6; Lawhorn Dec., PX 4, Appx. at 64, ¶ 5;
Mack Dec., PX 5, Appx. at 87, ¶ 8.

[14]    McKenney Dec., PX 10, Appx. at 167, ¶ 16 & Att. H, at 278-279; Appx. at
176-77, ¶ 40 & Att. I, at 312; Appx. at 184-85, ¶ 65 & Att. J, at 334; Appx. at 190-
91, ¶ 82 & Att. K, at 360; Appx. at 196-97, ¶ 100 & Att. L, at 379-80; Appx. at
199, ¶ 105 & Att. M, at 401-02; Appx. at 201-02, ¶ 111 & Att. N, at 435-37; Appx.
at 204, ¶ 119 & Att. O, at 483-85; Appx. at 206, ¶ 126 & Att. P at 507-08; Clark
Dec., PX 1, Appx. at 5, ¶ 8; Lawhorn Dec., PX 4, Appx. at 64, ¶ 5; Mack Dec., PX
5, Appx. at 87, ¶ 6; Ulmer Dec., PX 8, Appx. at 136, ¶ 3.

shipments of the product each month and charge their accounts the full price of each product shipped.[15]

In contrast to Defendants' bold claims that their trials are "RISK FREE," in high demand, of limited supply, or low-cost, Defendants disclose the charge for the trial product and the continuity program only in barely legible faint gray text at the bottom of the payment page, well below where consumers enter their billing information and click the "GET MY RISK FREE TRIAL" button.[16] For example, in the image above, that block of faint gray text reads in pertinent part:

> By placing an order you will be enrolled in our membership program. This program will charge $4.95 today and $84.71 for your trial full-size product on the 15th day if you do not call to cancel the membership. You will receive a full-size bottle of the product for $84.71 (S&H included) every 30 days thereafter until you cancel.

---

[15]     McKenney Dec., PX 10, Appx. at 167, ¶ 16 & Att. H, at 278-279; Appx. at 176-77, ¶ 40 & Att. I, at 312; Appx. at 184-85, ¶ 65 & Att. J, at 334; Appx. at 190-91, ¶ 82 & Att. K, at 360; Appx. at 196-97, ¶ 100 & Att. L, at 379-80; Appx. at 199, ¶ 105 & Att. M, at 401-02; Appx. at 201-02, ¶ 111 & Att. N, at 435-37; Appx. at 204, ¶ 119 & Att. O, at 483-85; Appx. at 206, ¶ 126 & Att. P at 507-08; Lawhorn Dec., PX 4, Appx. at 64, ¶ 5; Mack Dec., PX 5, Appx. at 87, ¶ 6; Ulmer Dec., PX 8, Appx. at 136, ¶ 3.

[16]     McKenney Dec., PX 10, Appx. at 167, ¶ 16 & Att. H, at 278-279; Appx. at 176-77, ¶ 40 & Att. I, at 312; Appx. at 184-85, ¶ 65 & Att. J, at 334; Appx. at 190-91, ¶ 82 & Att. K, at 360; Appx. at 196-97, ¶ 100 & Att. L, at 379-80; Appx. at 199, ¶ 105 & Att. M, at 401-02; Appx. at 201-02, ¶ 111 & Att. N, at 435-37; Appx. at 204, ¶ 119 & Att. O, at 483-85; Appx. at 206, ¶ 126 & Att. P at 507-08.

11

This text is the smallest, least prominent, and least distinct font on the payment page.  As a result, consumers do not even see these disclosures, let alone read them.[17]

Significantly, moreover, the disclosures are not visible at all to consumers who order the trial product on a mobile device.  As demonstrated in the figure below, the payments page often occupies the entire screen of a mobile device, meaning that consumers would have to scroll down below the "Continue" button before they would encounter Defendants' disclosures.[18]

---

[17]   Clark Dec., PX 1, Appx. at 6, ¶¶ 12 and 13 ("At no point during my purchase did I see a notice that said I would be charged the full purchase price of the product if I did not cancel within a certain number of days.  At no point during my purchase did I see a noice that said I was enrolling in a subscription service for the product."); Landreau Dec., PX 3, Appx. at 30, ¶ 4 ("Before placing my order, I did not see any disclaimer stating that I would be charged any amount in addition to the $4.95 shipping."); Ulmer Dec., PX 8, Appx. at 137, ¶ 8-9 ("At no point during my initial order did I see a notice telling me that I would be charged the full purchase price of the product if I did not cancel within a certain number days. At no point during my purchase did I see a notice telling me that I was enrolling in a subscription service for the product.").

[18]   McKenney Dec., PX 10, Appx. at 201-02, ¶ 11 & Att. N, at 435-36.

12



**B.   Defendants' Deceptive Order Completion Pages**

Consumers who submit their payment information and click the "GET MY RISK FREE TRIAL" or "CONTINUE" button are not taken to an order confirmation page.  Instead, consumers are taken to a page that says: "Wait!  Your Order Is Not Complete!"  As shown on the screenshot below, this page often includes an image of a coupon for a free trial of an additional product, which even

13

1  includes "free shipping."  Below the coupon is a brightly colored button labeled

2  "COMPLETE CHECKOUT."[19]



---

19  McKenney Dec., PX 10, Appx. at 168-69, ¶ 19 & Att. H, at 280-283; Appx. at 177-78, ¶¶ 42 and 4 & Att. I, at 313-316; Appx. at 185-86, ¶ 67 and 68 & Att. J, at 335-40; Appx. at 191, ¶ 84 & Att. K, at 361-68.

14

Defendants' prominent claim on this page that consumers' orders are not complete is false. By entering their billing information and clicking the button on the payments page, consumers have in fact completed their order of the initial trial product, and they will receive that trial regardless of what they do on this page.[20] Rather than completing their checkout, clicking the "COMPLETE CHECKOUT" button results in consumers being shipped an additional product – in the example above, Vitamood+.[21] Defendants then charge consumers the full price of this product – nearly $80 – 18 days later.[22] Defendants also enroll consumers in a second continuity program that includes monthly shipments of, and charges for, the second product.[23]

As with their initial "risk free" trials, Defendants inadequately disclose these important terms. They do so only in tiny, faint font, far from the brightly colored "COMPLETE CHECKOUT" button.[24] For example, in the image above, the miniscule disclosure at the bottom of the image reads in pertinent part:

---

[20] As shown in the image above, this additional product also carries with it its own pre-selected "Protect Package" fee of $6.95. Consumers will be charged this additional fee unless they uncheck the pre-checked box. McKenney Dec., PX 10, Appx. at 168-69, ¶ 19 & Att. H, at 280-283; Appx. at 177-78, ¶43 & Att. I, at 313; Appx. at 186, ¶ 68 & Att. J, at 335.

[21]    McKenney Dec., PX 10, Appx. at 168-69, ¶ 19 & Att. H, at 280-83.

[22]    *Id.*

[23]    *Id.*

[24]    *Id.*

15

> By placing an order you will be enrolled in our membership program. This program will charge $0.00 today and $ 79.31 for your trial full-size product on the 18th day if you do not call to cancel the membership.  You will receive a full-size bottle of the product for $ 79.31 (S&H included) every 30 days thereafter until you cancel.[25]

Consumers are unlikely to see these inadequately disclosed terms, and thus do not understand that, when they click "COMPLETE CHECKOUT," Defendants will send and bill them for an additional product. [26] The only way consumers can avoid the additional charges would be to find, understand, and click on another tiny, faint hyperlink that in the image above states, "No, I don't want to improve my mood."[27] But because consumers do not understand that they will receive and be charged for an additional product, they would have no reason to click this link. Regardless of whether consumers find and click this link or click to "COMPLETE CHECKOUT," Defendants redirect them to a series of web pages that make similar deceptive offers of additional products.[28]

---

[25]   *Id.*

[26]   *Id.*; Lawhorn Dec., PX 4, Appx. at 64, ¶ 5.

[27]   McKenney Dec., PX 10, Appx. at 168-69, ¶ 19 & Att. H, at 280-283; Appx. at 177-78, ¶¶ 42 and 43 & Att. I, at 313-316; Appx. at 185-86, ¶ 67 and 68 & Att. J, at 335-40; Appx. at 191, ¶ 84 & Att. K, at 361-68.

[28]   *Id.* Appx. at 169-70, ¶ 21-23 & Att. H, at 284-290; Appx. at 177-78, ¶¶ 43-46 & Att. I, at 313-316; Appx. at 185-86, ¶ 68-71 & Att. J, at 335-40; Appx. at 192, ¶ 86 & Att. K, at 361-68.

### C.   Defendants' Restrictive Cancellation and Refund Practices

Consumers typically discover Defendants' deception only after they receive the unordered products and their accounts have been charged.[29] They then have difficulty canceling and avoiding further charges.[30] Those who call or email Defendants often have difficulty reaching Defendants' customer service representatives, despite attempting to contact Defendants numerous times.[31] Consumers who do reach a customer service representative to request cancellation report that they often continue to receive and be charged for shipments of Defendants' products even after cancelling.[32]

Defendants also make it extremely difficult for consumers to obtain refunds. If consumers seek a refund more than 30 days after ordering the "free trial," they are denied a refund because such requests must be made within 30 days.[33] Where the refund period has not lapsed, Defendants tell consumers they can only get a full

---

[29]   Clark Dec., PX 1, Appx. at 5, ¶¶ 6 and 7; Landreau Dec., PX 3, Appx. at 30-31, ¶¶ 5 and 6; Mack Dec., PX 5, Appx. at 87, ¶ 6 ; McCallum Dec., PX 6, Appx. at 97-98, ¶¶ 5 and 6.

[30]   Fabbricante Dec., PX 2, Appx. at 22, ¶¶ 4-5 ; Landreau Dec., PX 3, Appx. at 31, ¶ 6; Mack Dec., PX 5, Appx. at 87, ¶ 8.

[31]   Pollard Dec., PX 7, Appx. at 115, ¶ 11.

[32]   McKenney Dec., PX 10, Appx. at 179-80, ¶ 51-53.

[33]   Mack Dec., PX 5, Appx. at 9, ¶ 9 (consumer offered half refund only for more recent of two bottles).

refund if they return the trial product at their own expense.[34]  But even if

consumers return the trial product within the refund period, they often are denied a

refund because Defendants purport to have never received the product.[35]

Once Defendants have denied them a refund, many consumers attempt to get

their money back by initiating chargebacks, otherwise disputing charges with their

credit card companies or cancelling the credit card or other billing account

altogether to avoid further unauthorized charges.[36]  Other consumers complain to

the BBB or a government agency, which often prompts Defendants to issue a

refund, even if one had been denied previously.[37]  Even in those instances,

however, Defendants frequently refund only the monthly continuity program

charges and refuse to issue refunds for the initial trial.[38]

---

[34]     Fabbricante Dec., PX 2, Appx. at 23, ¶ 7; Landreau Dec., PX 3, Appx. at 31-32, ¶¶ 8, 12; Pollard Dec., PX 7, Appx. at 115, ¶ 12.
[35]     McCraner Dec., PX 9, Appx. 150-51, ¶¶ 9 and 10.  Defendants also refuse to refund consumers the shipping and handling charges or inadequately disclosed "package protection" fees associated with their trials, even when the consumer cancels before any product is actually shipped. Ulmer Dec., PX 8, Appx. at 136-37, ¶¶ 5-9; Landreau Dec., PX 3, Appx. at 32, ¶ 11.
[36]     Mack Dec., PX 5, Appx. at 88-89, ¶ 11; Pollard Dec., PX 7, Appx. at 117, ¶¶ 18-19.
[37]     Fabbricante Dec., PX 2, Appx. at 23, ¶¶ 9-10; Landreau Dec., PX 3, Appx. at 33, ¶¶ 14-15; Ulmer Dec., PX 8, Appx. at 137, ¶ 6-8.
[38]     Landreau Dec., PX 3, Appx. at 33, ¶ 16; Lawhorn Dec., PX 4, Appx. at 65-66, ¶ 8, 14; Mack Dec., PX 5, Appx. at 88-89, ¶ 11; Ulmer Dec., PX 8, Appx. at 137, ¶ 10.

Not surprisingly, hundreds of consumers have complained to the BBB about defendants' deceptive practices.[39]

### III. Defendants

Defendant **Brian Phillips** controls this enterprise, operating it through Defendants **Triangle Media Corporation**, **Hardwire Interactive Inc.**, and a series of shell companies, including Defendant **Jasper Rain Marketing LLC**. Triangle Media and Hardwire Interactive control the websites where Defendants deceptively market their trial offers.[40] Defendants charge consumers for the trials and continuity plan shipments through one of Phillips's many shell companies and then ultimately funnel the proceeds back to Triangle Media, which is the hub of this enterprise.[41]

For example, consumers who order the trials are charged using payment processing accounts set up in the names of one of the shell companies.[42] The payments are deposited into the shell's checking account, which is controlled by

---

[39]   McKenney Dec., PX 10, Appx. at 227, ¶¶ 157-161; Fabbricante Dec., PX 2, Appx. at 23, ¶ 9; Landreau Dec., PX 3, Appx. at 32, ¶ 13; Mack Dec., PX 5, Appx. at 89, ¶ 12; Ulmer Dec., PX 8, Appx. at 114, ¶ 7.

[40]   On behalf of Hardwire Interactive, Triangle Media has registered the various websites where Defendants market and sell their deceptive trial offers, often under their brand names Phenom Health, Beauty and Truth, and E-Cigs. McKenney Dec., PX 10, Appx. at 210-13, ¶¶ 132-134.

[41]   McKenney Dec., PX 10, Appx. at 171, ¶ 27; Appx. at 214-16, ¶¶ 136-38; Appx. at 219-20, ¶¶144-47.

[42]   McKenney Dec., PX 10, Appx. 171, ¶ 27; Appx. at 214-16, ¶¶ 136-38.

Phillips.[43]  He then transfers the proceeds from the shell companies to Defendant

Triangle Media.[44]  Triangle Media then pays the operation's expenses, including

customer service, phone numbers, and other expenses incurred by Phillips.[45]  In

addition to collecting consumer payments, Triangle Media also receives substantial

sums from Defendant Hardwire Interactive before transferring tens of millions of

dollars offshore.[46]

A classic common enterprise exists among Defendants Triangle Media,

Hardwire Interactive, and Jasper Rain, all of whom, as described above, engage in

a common scheme under Phillip's control.  "Where one or more corporate entities

operate as a common enterprise, each may be held liable for the deceptive acts and

practices of the others." *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993,

1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002); *see also FTC v. John

Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2013) (quoting

*Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (when individuals

transact business through a "maze of interrelated companies," the whole enterprise

is liable as a joint enterprise)); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176,

1202 (C.D. Cal. 2000).  A common enterprise can be demonstrated by the

---

[43]   *Id.*, Appx. 216-19, ¶¶ 139-143; Appx. at 219-20, ¶¶ 144-47.

[44]   *Id.*, Appx. 219-20, ¶¶ 144-47; Appx. 220-23, ¶¶ 148-152.

[45]   *Id.*, Appx. 220-23, ¶¶ 148-152.

[46]   *Id.*, Appx. 220-23, ¶¶ 150 and 151.

existence of a maze of interrelated companies, the commingling of corporate funds, unified advertising, and sharing of resources and staff. *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

Here, the Defendant companies commingle funds,[47] share common personnel and customer service operations,[48] are commonly controlled,[49] and engage in a common scheme.[50] Although Defendants' shell companies, including Jasper Rain, list mail drops as their business addresses,[51] they are actually operated by Triangle Media from Triangle Media's business locations.[52] The principals of Hardwire Interactive and Jasper Rain are employees of Triangle Media.[53] As a result, the entities are jointly and severally liable for the conduct of the enterprise.

## IV.    Argument

Defendants' deceptive scheme violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 4 of ROSCA, 15 U.S.C. § 8403, Section 907(a) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).  To prevent any further injury

---

[47]    McKenney Dec., PX 10, Appx. at 216-23, ¶¶ 139-152.

[48]    *Id.*, Appx. at 207-13, ¶¶ 127-135; Appx. at 223-24, ¶ 153.

[49]    *Id.*, Appx. at 214-22, ¶¶ 136-152

[50]    *Id.*, Appx. at 207-27, ¶¶ 127-156.

[51]    *Id.*, Appx. at 224-26, ¶ 154.

[52]    *Id.*, Appx. at 207-27, ¶¶ 127-156.

[53]    *Id.*, Appx. at 163, ¶¶ 6 and 7; Appx. at 164, ¶¶ 9 and 10; Appx. at 224, ¶ 153.

to consumers, the FTC asks that the Court issue *ex parte* the proposed TRO. This order would enjoin Defendants' ongoing law violations and would provide other equitable relief designed to preserve the Court's ability to provide restitution to victims at the conclusion of the case.

### A.     This Court Has the Power to Grant the Requested Relief

Section 13(b) of the FTC Act authorizes the Commission to seek, and this Court to issue, temporary, preliminary, and permanent injunctions. 15 U.S.C. § 53(b). Once the Commission invokes the court's equitable powers, the full breadth of the court's authority is available, including the power to grant such ancillary final relief as an asset freeze to preserve assets for eventual restitution to victims. *FTC v. Pantron I Corp.*, 33 F. 3d 1088, 1102 (9th Cir. 1994); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982). Federal courts in this district and elsewhere have routinely granted *ex parte* TROs with asset freezes in FTC cases,[54] including in FTC cases brought against online rebilling schemes like Defendants' operation.[55]

---

[54]      *See e.g., FTC v. Membership Servs., Inc.*, 01-cv1868 (S.D. Cal. Oct. 17, 2001); *FTC v. National Art Pubs. & Distribs., Inc.*, CV-94-0518 (S.D. Cal. Apr. 5, 1994); *FTC v. Pac. Med. Clinics*, CV-90-1277 (S.D. Cal. Sept. 19, 1990); *FTC v. Properties Int'l*, CV-90-756 (S.D. Cal. June 6, 1990). In addition to the Southern District of California, other districts in the Ninth Circuit routinely grant *ex parte* TROs like the one proposed here. *See, e.g., FTC v. A1 DocPrep Inc.*, CV-17-07044 (C.D. Cal. Sept. 28, 2017); *FTC v. Alliance Document Prep.*, CV-17-7048 (C.D. Cal. Sept. 28, 2017); *FTC v. M&T Fin. Group*, CV-17-6855 (C.D. Cal. Sept. 19, 2017); *FTC v. Good Ebusiness, LLC*, CV-16-1048-ODW (C.D. Cal. Feb. 16,

**B.**     **The FTC Meets the Standard for Issuance of a Temporary Restraining Order**

A temporary restraining order is appropriate once the FTC shows (1) a likelihood of success on the merits and (2) that the equities weigh in the FTC's favor. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) (citing *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)). Unlike private litigants, the FTC need not prove irreparable harm. *See id.*; *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir. 1989). As demonstrated below, the FTC has demonstrated that it will succeed on the merits of its claims and that the balance of the equities favors injunctive relief.

**1.**     **The FTC is Likely to Succeed on the Merits**

To demonstrate that it is likely to succeed on the merits, the FTC need only present evidence that it has "some chance of probable success." *World Wide Factors*, 882 F.3d at 347 (citation omitted). Here, the overwhelming evidence shows that: (1) Defendants engage in unfair and deceptive practices that violate Section 5(a) of the FTC Act; (2) Defendants make unauthorized charges on

2016); *FTC v. Telestar Consulting, Inc.*, CV-16-555-SJO (SSx) (C.D. Cal. Feb. 1, 2016); *FTC v. BAM Fin., LLC*, SACV15-01672 (C.D. Cal. Oct. 21, 2015); *FTC v. Sale Slash, LLC*, SACV15-3107 (C.D. Cal. Apr. 27, 2015); *FTC v. Wealth Educators, LLC*, SACV15-2357 (C.D. Cal. Apr. 6, 2015); *FTC v. Grant Connect, LLC*, No. 09-01349 (D. Nev. July 28, 2009).

[55]     *See, e.g., FTC v. RevMountain, LLC*, 17-cv-02000-APG-GWF (D. Nev. July 24, 2017) (*ex parte* TRO in ROSCA case); *FTC v. Bunzai Media Group, Inc.*, No. CV15-C4527-GW (PLAx) (C.D. Cal. June 15, 2015) (same); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649 (D. Nev. Oct. 9, 2014) (same).

23

consumers' credit and debit cards in violation of ROSCA; and (3) Defendants make unauthorized deductions from consumers' bank accounts in violation of EFTA and Regulation E.  The evidence also shows that Defendant Phillips is individually liable for these practices.  Accordingly, the FTC is likely to succeed on the merits of its claims.

**a.**      **Defendants Are Violating the FTC Act**

Defendants' online marketing practices violate Section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a).  Defendants' practices are both deceptive and unfair.

**i.**      **Defendants' Practices Are Deceptive Under the FTC Act**

An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.  *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *Pantron I*, 33 F.3d at 1095. A representation or omission is material if it "'involves information that is likely to affect a consumer's choice of, or conduct regarding, a product or service.'" *Cyberspace.com*, 453 F.3d at 1201 (quoting deception standard set forth in *In re Cliffdale Assocs.*, 103 F.T.C. 110, 164-65 (1984)).  Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material.  *Pantron I*, 33 F.3d at 1096.

24

In determining whether a practice is likely to mislead consumers acting reasonably, the Court determines the overall "net impression" that Defendants' representations make upon consumers. *Cyberspace.com*, 453 F.3d at 1200. Fine-print disclosures do not overcome a deceptive net impression. *See Cyberspace.com*, No. C00-1806L, 2002 U.S. Dist. LEXIS 25564, *8-9 (W.D. Wash. July 10, 2002) (holding that a fine print disclosure was inadequate to escape liability), *aff'd*, 453 F.3d at 1200 (collecting cases where deception found because fine print disclosures were inadequate). Consumer reliance upon express claims is presumptively reasonable. *FTC v. Five-Star Audio Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (citation omitted).

Here, Defendants have materially misled consumers about their "risk free" trials in at least three ways. First, Defendants misrepresent the price of the trial offer. Defendants falsely state that the consumer will only pay for shipping and handling, typically $4.95, to receive a trial of Defendants' product. In reality, Defendants' charge consumers the full price, up to $98.71, for a 30-day supply of the product. This express representation is presumed to be material because it influenced the consumer's decision to order a trial of Defendants' product. *FTC Policy Statement on Deception*, 103 F.T.C. 175, 182 (1983); *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992).

25

Second, Defendants misrepresent to consumers who have ordered a trial of Defendants' product that the order is not complete until they click a "COMPLETE ORDER" button or take further action.  In fact, the consumer's order is already complete before they click the "COMPLETE ORDER" button.  This misrepresentation causes consumers to unwittingly order an additional product, to thereby incur additional charges, and be enrolled in yet another continuity program.

Third, Defendants fail to adequately disclose several material terms of their purported "trial offer" including: (1) the total cost of the product; (2) that consumers will be charged the full cost of the trial product after 15 days; (3) that the consumer is automatically enrolled in a continuity program; and (4) the total cost of the continuity program and the frequency and duration of the recurring charges.

### ii.   Defendants Also Violate the FTC Act by Unfairly Billing Consumers Without Authorization

An act or practice is unfair if it causes, or is likely to cause, substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition.  *FTC v. Neovi*, 604 F.3d 1150, 1153 (9th Cir. 2010).  Substantial injury may consist of "small harm to a large number of people" or "a significant risk of concrete harm."  *Id.* at 1157.

26

Courts routinely find substantial injury where a defendant has billed consumers for charges they did not authorize. *See e.g., Neovi*, 604 F.3d at 1157; *FTC v. Ideal Fin. Sols.*, No: 2:13-cv-00143-JAD-GWF, 2015 U.S. Dist. LEXIS 86348, at *30 (D. Nev. June 29, 2015) ("[T]aking consumers' funds without authorization causes substantial injury, even when the amount taken is relatively small.").

Here, hundreds of consumers have complained about Defendants' unauthorized charges ranging from $2.95 to $98.71.[56] This fact alone proves substantial injury. *See, e.g., FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008) (substantial injury resulted from unauthorized charges to tens of thousands of customers), *aff'd*, 604 F.3d 1150 (9th Cir. 2010); *FTC v. Windward Mktg.*, No. 1:96-CV-615F, 1997 U.S. Dist. LEXIS 17114, at *31 (N.D. Ga. Sep. 30, 1997) (harm to large number of consumers sufficient to establish substantial injury). And "the time spent pursuing refunds constitutes additional injury" to consumers. *FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 U.S. Dist. LEXIS 55569, at *17 (W.D. Wash. April 26, 2016).

Further, the injury was not reasonably avoidable. Injury is not reasonably avoidable unless consumers have a "free and informed choice" to avoid the harm. *Neovi*, 604 F.3d at 1158. Where, as here, consumers have been billed for charges they did not authorize, courts regularly find that consumers did not have a choice

---

[56]   McKenney Dec., PX 10, Appx. at 227, ¶¶ 157-61.

to avoid the injury before it occurred. *See e.g., Neovi*, 598 F. Supp. 2d at 1116;

*FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010) ("As other courts

have wisely concluded, the burden should not be placed on defrauded customers to

avoid charges that were never authorized to begin with.").

Finally, unauthorized billing does not produce any offsetting benefits to

consumers or competition that outweigh the consumer injury. *See, e.g., Amazon*,

2016 U.S. Dist. LEXIS 55569, at *22 (in unauthorized billing case, "cost–benefit

prong . . . easily satisfied"); *Inc21.com*, 745 F. Supp. 2d at 1004 ("[I]t cannot be

said that defendants' 'customers' benefitted at all from services that they never

agreed to purchase, didn't know were being provided to them, and never wanted in

the first place."). The cost of Defendants' practice of charging consumers without

authorization, on the other hand, is significant and concrete: monetary loss to

consumers in the millions of dollars.

### b. Defendants' Undisclosed, Unauthorized Charges Violate ROSCA

Defendants' billing practices also violate ROSCA. ROSCA prohibits

charging consumers for goods or services sold online through a negative option

feature like Defendants' continuity plans, unless the seller meets certain

conditions. Specifically, section 4 of ROSCA, 15 U.S.C. § 8403, requires that the

seller (1) clearly and conspicuously disclose all material terms of the transaction

before obtaining the consumer's billing information, (2) obtain the consumer's

express informed consent before making the charge, and (3) provide a simple

mechanism to stop recurring charges.

Defendants violate ROSCA in three ways.  First, Defendants fail to disclose

clearly and conspicuously the material terms of their continuity plans before

obtaining consumers' billing information.  Instead, their terms, as another court in

this Circuit described similarly inadequate disclosures, "are either buried in fine

print on the payment page . . . or are stated in Terms and Conditions documents

that consumers are not required to read." *See FTC v. Health Formulas, LLC*, No.

2:14-cv-01649, 2015 U.S. Dist. LEXIS 59387, at *48 (D. Nev. May 6, 2015); *cf.*

*Barrer v. Chase Bank United States, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009)

("clear and conspicuous disclosures" are disclosures that a reasonable consumer

"would notice and understand").

Second, Defendants routinely charge consumers' accounts on a monthly

basis as part of a continuity plan without obtaining their express informed consent.

Because Defendants have not disclosed to consumers the material terms of their

offers, they do not obtain consumers' express informed consent before charging

them. *Health Formulas, LLC*, No. 2:14-cv-01649, 2015 U.S. Dist. LEXIS 59387,

at *48.  Moreover, after violating ROSCA in connection with the initial "trial"

offer, Defendants violate it again by failing to obtain express informed consent to

29

the additional charges resulting from Defendants' deceptive order completion page.

Third, Defendants fail to provide a simple mechanism for cancelling the continuity plan.[57] *See Health Formulas, LLC*, 2015 U.S. Dist. LEXIS 59387 at *49. Even when consumers do figure out the process to cancel, they report difficulty in reaching Defendants' representatives, and are charged even after they have cancelled.[58]

### c. Defendants' Unauthorized Debits also Violate the Electronic Fund Transfer Act and Regulation E

The EFTA and its implementing Regulation E regulate the circumstances under which a merchant may make regularly recurring debits from a consumer's bank account. EFTA and Regulation E require that before a merchant may make such recurring debits, it must obtain a written authorization signed or similarly authenticated by the consumer. 15 U.S.C. § 1693e(a); 12 C.F.R. § 205.10(b). For an authorization to be valid, the terms of the preauthorization transfer must be "clear and readily understandable" and the authorization "should evidence the consumer's identity and assent to the authorization." *Consumer Financial*

---

[57]   McKenney Dec., PX 10, Appx. at 172-174, ¶¶ 30-35; Appx. at 179-182, ¶¶ 51- 59; Appx. at 194-96, ¶¶ 93-97.

[58]   *Id.*; Clark Dec., PX 1, Appx. at 5-6, ¶¶ 7-11; Fabbricante Dec., PX 2, Appx. at 22-23, ¶¶ 3-10; Lawhorn Dec., PX 4, Appx. at 64-66, ¶¶ 6-13; Mack Dec., PX 5, Appx. 87-89, ¶¶ 8-11; McCallum Dec., PX 6, Appx. at 98-99, ¶¶ 7-9; Pollard Dec., PX 7, Appx. 115-16, ¶¶ 10-15; Ulmer Dec., PX 8, Appx. at 136-37, ¶¶ 4-5; McCraner Dec., PX 9, Appx. 148-51, ¶¶ 5-10.

*Protection Board's Official Staff Commentary to Regulation E*, 12 C.F.R. Part 205, Supp. I, ¶ 10(b), comments (5) & (6).  Moreover, a copy of the authorization must be provided to the consumer.  15 U.S.C. § 1693e(a); 12 C.F.R. § 205.10(b).  These protections ensure that consumers' consent to recurring debits will be knowing and informed.  A consumer's rights under EFTA cannot be waived. 15 U.S.C. § 1693l.

Defendants' business practices fail to comply with EFTA.  Because Defendants do not adequately disclose the terms of their continuity plan and that consumers will be charged monthly, consumers did not knowingly authorize Defendants to make recurring debits from their bank accounts.[59]  Moreover, consumers do not receive a copy of any purported authorization for debits to their bank accounts.[60]

## 2.    The Balance of Equities Strongly Favors Injunctive Relief

Once the FTC has shown a likelihood of success on the merits, the Court must balance the equities, giving far greater weight to the public interest than any of Defendants' private concerns.  *See Affordable Media*, 179 F.3d at 1236; *World Wide Factors*, 882 F.2d at 347.  Here, there is a strong public interest in stopping Defendants' deceptive scheme and preserving assets for a meaningful monetary

---

[59]    McKenney Dec., PX 10, Appx. at 167, ¶ 16 & Att. H, at 278-279; Appx. at 176-77, ¶ 40 & Att. I, at 312; Appx. at 184-85, ¶ 65 & Att. J, at 334; Appx. at 190-91, ¶ 82 & Att. K, at 360; Appx. at 196-97, ¶ 100 & Att. L, at 379-80; Appx. at 199, ¶ 105 & Att. M, at 401-02; Appx. at 201-02, ¶ 111 & Att. N, at 435-37; Appx. at 204, ¶ 119 & Att. O, at 483-85; Appx. at 206, ¶ 126 & Att. P at 507-08.
[60]    *Id.*

31

remedy for consumers.  Defendants, in contrast, have no legitimate interest in

continuing to deceive consumers, and compliance with the law is hardly an

unreasonable burden.  *See World Wide Factors*, 882 F.2d at 347 ("[T]here is no

oppressive hardship to defendants in requiring them to comply with the FTC Act,

refrain from fraudulent representation or preserve their assets from dissipation or

concealment.").

> ### 3.   Defendant Phillips is Individually Liable for Defendants' Practices

Defendant Phillips is individually responsible for Defendants' illegal

activity.  Once the FTC establishes corporate liability, an individual may be held

jointly and severally liable under the FTC Act where he (1) participated directly in

or had some measure of control over a corporation's deceptive practices, and

(2) knew or should have known of the deceptive practices.  *FTC v. Stefanchik*, 559

F.3d 924, 931 (9th Cir. 2009).  Authority to control can arise from "active

participation in corporate affairs, including assuming the duties of a corporate

officer."  *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

Likewise, the FTC can show that an individual knew or should have known of

corporate defendants' activities if the individual was a principal owner or officer,

controlled the business's finances, or oversaw its activities.  *Amy Travel*, 875 F.2d

at 574-75; *see Affordable Media*, 179 F.3d at 1234 ("The extent of an individual's

involvement in a fraudulent scheme alone is sufficient to establish the requisite

32

knowledge for personal restitutionary liability."). The FTC is not required to demonstrate subjective intent to defraud. *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997).

Here, Phillips runs Defendants' deceptive scheme. He is the sole officer of Triangle Media.[61] He is a signatory on dozens of bank accounts related to the scheme, including those that are nominally held by the shell companies,[62] and is listed on the applications for several merchant processing accounts to bill consumers' credit and debit cards.[63] He also registered and paid for the website used to track Defendants' illegal marketing tactics.[64] Courts routinely find individual liability in such circumstances. *See FTC v. DiscountMetalBrokers, Inc.*, No. 2:16-cv-2112-ODW(JC), 2017 U.S. Dist. LEXIS 164878, at *14-15 (Oct. 4, 2017); *FTC v. Mortg. Relief Advocates*, No. CV-14-5434-MWF (AGRx), 2015 U.S. Dist. LEXIS 18609, at *17 (C.D. Cal. July 1, 2015).

C.      The Scope of the Proposed Temporary Restraining Order is Necessary and Appropriate

The evidence shows that the FTC is likely to succeed in showing that Defendants violated the law, and the balance of the equities weighs in the FTC's favor. The FTC therefore requests that the Court issue a TRO that prohibits future

---

[61]     McKenney Dec., PX 10, Appx. at 162, ¶¶ 4 and 5.
[62]     *Id.*, Appx. at 216-20, ¶¶ 139-47.
[63]     *Id.*, Appx. at 214-16, ¶¶ 136-38.
[64]     McKenney Dec., PX 10, Appx. at 213, ¶ 135.

law violations,[65] preserves assets for eventual restitution to victims, and imposes a temporary receivership over the corporate defendants.[66]  Such an order is well within the Court's authority.

Courts have authority under 15 U.S.C. § 53(b) to impose an asset freeze to preserve the possibility of providing restitution to victimized consumers.  *See, e.g., FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996); *World Wide Factors*, 882 F.2d at 347; *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987) (FTC's power to petition for injunctive relief and asset freeze "well established").  An asset freeze is appropriate here given the deceptive nature of Defendants' scheme and the magnitude of financial injury.  *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) ("Because of the fraudulent nature of appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors money.").

Defendants have taken tens of millions of dollars from consumers and already have moved some of those funds offshore.  Defendant Hardwire Interactive is based in the British Virgin Islands and holds its accounts offshore.  Triangle Media also has already transferred millions of dollars in proceeds from the scheme

---

[65]  Specifically, the requested conduct prohibitions in the proposed TRO require only that the Defendants comply with the FTC Act, ROSCA, and the EFTA and Regulation E.

[66]  The FTC has filed a proposed TRO concurrently with this application.

to Canada.[67]  Thus, in the absence of an asset freeze, there is a very real risk that

Defendants will move additional funds offshore, thereby threatening the Court's

ability to provide eventual restitution to victims.

The appointment of a temporary receiver for the Corporate Defendants is

also appropriate.  "The district court's exercise of its equity power in this respect is

particularly necessary in instances in which the corporate defendant, through its

management, has defrauded members of the investing public," *SEC v. First Fin.*

*Group*, 645 F.2d 429, 438 (5th Cir. 1981).  *See In the Matter of McGaughey*, 24

F.3d 904, 907 (7th Cir. 1994) (appointment of receiver is "an especially

appropriate remedy in cases involving fraud and the possible dissipation of

assets"); *see also FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir.

1984).  Here, where there is overwhelming evidence that Defendants are engaged

in widespread deception, a receiver could help assess the extent of the fraud,

prepare an accounting, and make an independent report of Defendants' activities to

the Court.  Additionally, a receiver could prevent the destruction of documents and

the dissipation of assets while the case is pending.

**D.     The Temporary Restraining Order Should be Issued *Ex Parte* to
Preserve the Court's Ability to Fashion Meaningful Relief**

The requested TRO should be issued *ex parte* to prevent Defendants from

dissipating assets or destroying evidence.  *Ex parte* relief is appropriate when

---

[67]     McKenney Dec., PX 10, Appx. at 221, ¶ 150.

immediate and irreparable injury, loss, or damage will occur before the defendants can be heard in opposition. *See* Fed. R. Civ. P. 65(b); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). Courts have routinely granted the FTC's requests for *ex parte* TROs in Section 13(b) cases like this one.[68]

Here, immediate and irreparable injury will likely result if notice is provided to Defendants.[69] Given the fraudulent nature of their scheme and strength of the evidence establishing their liability, Defendants would have every incentive to dissipate assets and destroy inculpatory evidence if given prior notice of the FTC's motion. Indeed, Defendants' use of multiple shell entities, and Defendant Phillips' efforts to conceal his association with those entities, demonstrate Defendants' attempts to evade detection. And Defendants have already transferred tens of millions of dollars out of the country.[70] For all these reasons, *ex parte* relief is both appropriate and necessary.

---

[68]    *See supra* notes 54 and 55.

[69]    The FTC's experience has shown that, upon discovery of legal action, many defendants withdraw funds, destroy vital documents, and flee. *See* Certification and Declaration of Plaintiff's Counsel Pursuant to Federal Rule of Civil Procedure 65(b) in Support of Plaintiff's *Ex Parte* Motion for Temporary Restraining Order and *Ex Parte* Application to Temporarily Seal Case File. Indeed, When previously contacted by the BBB regarding one of their shell entities, Defendants promptly dissolved the entity and continued doing business under a new name. McKenney Dec., PX 10, Appx. at 226-27, ¶ 155 and 156 & Att. Y and Z, at 600-611.

[70]    McKenney Dec., PX 10, Appx. at 221, ¶ 150.

## V.    Conclusion

For the reasons set forth above, the FTC respectfully requests that the Court

enter the proposed TRO and require that Defendants show cause why a preliminary

injunction should not issue.

Respectfully submitted,

Dated:  June 25, 2018

ALDEN F. ABBOTT
General Counsel

Samantha Gordon
Matthew H. Wernz
Federal Trade Commission
Midwest Region
230 South Dearborn Street, Suite 3030
Chicago, Illinois 60604
sgordon@ftc.gov
mwernz@ftc.gov
312-960-5623 (Gordon)
312-960-5596 (Wernz)

Attorneys for Plaintiff
Federal Trade Commission