# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                                    Plaintiff,<br><br>v.<br><br>TRIANGLE MEDIA CORPORATION;<br>JASPER RAIN MARKETING LLC;<br>HARDWIRE INTERACTIVE INC.; and<br>BRIAN PHILLIPS,<br><br>                                    Defendants. | Case No.:  18cv1388-MMA (NLS)<br><br>**MEMORANDUM ORDER RE:**<br>**PRELIMINARY INJUNCTION**<br><br><br><br><br><br>[Doc. No. 5] |

On June 25, 2018, Plaintiff the Federal Trade Commission ("Plaintiff" or "the FTC") filed its Complaint for Permanent Injunction and Other Equitable Relief against Defendants Triangle Media Corporation ("Triangle Media"), Jasper Rain Marketing LLC ("Jasper Rain"), Hardwire Interactive, Inc. ("Hardwire"), and Brian Phillips ("Phillips"), for violations of Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, and Section 918(c) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c).  Doc. No. 1 ("Compl.").  On June 29, 2018, the Court granted in part the FTC's request to issue an *ex parte* Temporary Restraining Order ("TRO"), in which the Court appointed a Receiver and ordered an asset freeze.  Doc. No. 11 ("TRO").  After

Defendants received notice of this action, the Court extended the expiration date of the TRO to August 9, 2018, on stipulation of the parties. Doc. Nos. 19, 22. On July 17, 2018, the Court denied Hardwire's motion to modify the TRO. Doc. No. 31. Upon consideration of the FTC's and Receiver's briefs and evidence in support of its request for continued injunctive relief in the form of a preliminary injunction (Doc. Nos. 30, 46, 47, 59), Defendants' briefs and evidence in opposition (Doc. Nos. 34, 36, 41, 63), and the arguments and evidence presented at the Preliminary Injunction hearing held on August 9, 2018 (*see* Doc. Nos. 65, 66), the Court affirms its tentative ruling and **GRANTS IN PART** the FTC's request for a preliminary injunction against Defendants [Doc. No. 5], which is issued this date in a separate document entitled "Preliminary Injunction."

## FACTUAL BACKGROUND

### A. *Defendants' Practices*

Defendants advertise, market, promote, distribute, and sell skincare products, electronic cigarettes, and dietary supplements online. Compl., ¶12. Defendants allegedly offer trials of these products for the cost of shipping and handling. *Id.* However, Plaintiff alleges that Defendants instead charge consumers who accept the trial offers as much as $98.71 for a single shipment and enroll them in a continuity program costing the same amount on a monthly basis. *Id.* According to Plaintiff, Defendants also frequently charge consumers for additional products and enroll consumers in continuity programs related to these additional products without the consumers' knowledge or consent. *Id.* Plaintiff alleges that when consumers who discover the charges seek a refund, they often are unable to get their money back because of Defendants' undisclosed refund restrictions. *Id.* Allegedly, Defendants have brought in tens of millions of dollars through their "deceptive trial offers." *Id.*

### 1. *Trial Offers*

Plaintiff alleges that Defendants advertise through third-party websites, blog posts, banner advertisements, and surveys, offering consumers a trial of products, including "Wrinkle Rewind," "Pro Vapor," "Cerebral X," "Test X Core," and "Garcinia Clean

XT." Compl., ¶ 13. The advertisements often say consumers can receive a trial for just the cost of shipping and handling. *Id.* When consumers click on the advertisements, they are re-directed to Defendants' websites, including findthebeautyandtruth.com, trycerebralx.com, tryphenomcore.com, tryprovapor.com, and trygarciniaclean.com. *Id.* These websites offer a "RISK FREE" trial of Defendants' products and "create a sense of urgency by telling consumers there is a limited supply of the trial product and that they need to act quickly." Compl., ¶ 14.

Consumers interested in the trial offer are asked to provide their contact information and directed to a payment page on which Defendants request their credit or debit card information and represent that consumers need only pay a shipping and handling charge to receive a trial of the product. Compl., ¶ 15. Once consumers enter their billing information, they are asked to place their order by clicking a brightly colored button that says either "GET MY RISK FREE TRIAL" or "CONTINUE." Compl., ¶ 17. Fifteen days later and unbeknownst to consumers, Defendants charge consumers the full price of the product. Compl., ¶ 18. Additionally, Defendants allegedly enroll consumers who accept the trial offer into a continuity program where Defendants send consumers additional shipments of the product each month and charge consumers' credit or debit cards the full price of each product shipped. Compl., ¶ 19. Plaintiff alleges that consumers typically do not learn that the trial was not free and that they have been enrolled in a continuity program until they see Defendants' monthly charges on their credit card or bank statements. Compl., ¶ 20.

Plaintiff alleges that Defendants either hide the terms of their offer in "barely discernable print far below the colorful graphics and text where consumers input their personal and payment information and continue with their purchase, or bury them in a separate 'Terms & Conditions' hyperlink." Compl., ¶ 21. Typically, the terms reveal that the consumer has usually fifteen days to cancel the trial or they will be charged the full price of the product and that they will be charged for additional shipments of the product every 30 days until they cancel. *Id.* According to Plaintiff, "[a]s a result of these

3

inadequate disclosures, Defendants' websites misrepresent the total cost of Defendants' trial products, and fail to adequately apprise consumers that they are being enrolled in a continuity program." Compl., ¶ 23.

### 2. Order Completion Page

After consumers click on the "GET MY RISK FREE TRIAL" or "CONTINUE" buttons, Plaintiff alleges they are directed to a webpage that indicates their order is not complete. Compl., ¶ 24. The webpage also offers a "FREE" trial of a different product. *Id.* Below the advertisement for the additional free trial is a button that says "COMPLETE CHECKOUT." Compl., ¶ 25. When consumers click that button, Plaintiff alleges "they are deemed by Defendants to have ordered a trial of both the original product and the second product." Compl., ¶ 26. However, if consumers do not click the "COMPLETE CHECKOUT" button, they will still receive a trial of the first product. *Id.*

Defendants allegedly represent the second product is free, but charge the consumer the full price of the product 18 days later. Compl., ¶ 27. Additionally, consumers who click the "COMPLETE CHECKOUT" button are enrolled in a second continuity program, meaning they will be charged for monthly shipments of the second product. *Id.* The "order completion page" allegedly fails to disclose important terms and conditions of the offer, including adequate disclosure that Defendants will charge the consumer the full price of the product after 18 days and will enroll them in a continuity program. *Id.* Plaintiff concedes that these terms appear on the page, but only "in small, faint print well below the prominent 'COMPLETE CHECKOUT' button." Compl., ¶ 28. Also in tiny, faint print, and below a line-break, there is a hyperlink that consumers can click to decline the second offer. Compl., ¶ 29. Consumers who click this link are then re-directed to a series of webpages that make similar deceptive offers. *Id.*

Once consumers place an order for one or more of Defendants' products, they allegedly receive a confirmation email which either does not list any charges associated with the products or lists only the shipping and handling charges. Compl., ¶ 30. Plaintiff

4

alleges that, therefore, the confirmation emails reinforce the false impression that other than the obligation to pay shipping and handling the trial product is free.  *Id.*

### 3. Cancellation and Refund Practices

"In numerous instances, consumers who ordered Defendants' trial products report that Defendants subsequently charge them without their knowledge or consent for the full price of these products and sign them up for one or more continuity programs."  Compl., ¶ 31.  Many consumers then try to cancel their enrollment in the continuity programs and to obtain a refund of the unauthorized charges.  *Id.*  Plaintiff alleges that these consumers often have difficulty cancelling and obtaining refunds.  *Id.*  Allegedly, consumers who call Defendants to cancel the trial and continuity programs have difficulty reaching Defendants' customer service representatives, and even if they do reach a customer service representative to request cancellation, consumers report that they often continue to receive and be charged for shipments even after cancelling.  Compl., ¶ 32.  The same is allegedly "sometimes true" when consumers use Defendants' "easy" online cancellation. *Id.*  Consumers who request a refund are often told they cannot obtain one because of Defendants' terms and conditions, which require that refund requests be made within 30 days.  Compl., ¶ 33.  Where consumers call within 30 days, consumers are told they can only get a refund if they return the trial product unopened and at the consumer's expense. *Id.*  Plaintiff alleges that often, consumers who send back the product unopened and within the refund period are still refused a refund.  *Id.*  In these instances, Defendants' customer service representatives tell the consumer that Defendants never received the return shipment.  *Id.*

"In many instances, consumers attempt to get their money back by initiating chargebacks with their credit card companies.  In other instances, consumers receive refunds directly from Defendants only after they complain to the Better Business Bureau or a state regulatory agency.  Even in those instances, however, Defendants have not always issued full refunds, but have refunded only the monthly continuity program charges."  Compl., ¶ 34.

#### 4. Consumer Injury

As a result of these allegations, Plaintiff alleges that consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations outlined below. Compl., ¶ 65. In addition, Plaintiff alleges Defendants have been unjustly enriched as a result of their unlawful acts or practices. *Id.*

Plaintiff prays for the following relief: (1) temporary and preliminary injunctive relief and ancillary relief necessary to avert the likelihood of consumer injury during the pendency of the action; (2) a permanent injunction to prevent future violations of the FTC Act, ROSCA, and the EFTA by Defendants; (3) relief necessary to redress consumer injury, including rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement of ill-gotten monies; and (4) the cost of bringing the action.

### B. *Causes of Action*

Accordingly, the FTC raises six causes of action. *See generally*, Compl.

#### 1. Violations of the FTC Act

Section 5(a) of the FTC Act prohibits unfair or deceptive practices in or affecting commerce. Compl., ¶ 35. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices under section 5(a). Compl., ¶ 36. Moreover, acts and practices are unfair under section 5(a) if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. *Id.*

##### a. Count 1: Misrepresentations of the Price of the Trial Offers

Plaintiff alleges that Defendants' representation that they will charge consumers at most only shipping and handling for a one-time shipment of Defendants' products is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act because Defendants actually charge consumers more than shipping and handling fees for one or more shipments of Defendants' products. Compl., ¶¶ 38-40.

//
//

### b.    Count 2: Misrepresentation that Order is Not Complete

Plaintiff alleges that Defendants' representation that consumers orders are not complete until they click the "COMPLETE CHECKOUT" button is false and misleading and constitutes a deceptive act in violation of Section 5(a) of the FTC Act because the orders were complete and clicking the "COMPLETE CHECKOUT" button orders additional product and enrolls consumers in a continuity plan for that additional product. Compl., ¶¶ 41-43.

### c.    Count 3: Failure to Disclose Adequately Material Terms of Trial Offer

Plaintiff alleges that Defendants' representation that consumers can obtain a trial of Defendants' product for the cost of shipping and handling, or for free, is a deceptive act in violation of Section 5(a) of the FTC Act because Defendants have failed to disclose, or adequately disclose, material terms and conditions of their offer, including the cost of the product, that Defendants will charge consumers the total cost of the trial product upon expiration of the trial period, that Defendants will automatically enroll consumers in a continuity plan with additional charges, and the cost of the continuity plan and the frequency and duration of the recurring charges.  Compl., ¶¶ 44-46.

### d.    Count 4: Unfairly Charging Consumers Without Authorization

Plaintiff alleges that Defendants' practices of charging consumers without their express informed consent cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition and constitute unfair acts or practices in violation of Section 5(a) of the FTC Act.  Compl., ¶ 47-49.

### 2.    *Violations of ROSCA*

The ROSCA generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express

informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges. Compl., ¶ 51. A negative option feature is defined as follows: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as an acceptance of the offer." Compl., ¶ 52. Plaintiff alleges that Defendants' auto-renewal continuity plan constitutes a negative option feature. Compl., ¶ 53.

a.    Count 5: Auto-Renewal Continuity Plan

Plaintiff alleges that Defendants' failure to (1) clearly and conspicuously disclose all material terms of the negative option feature of the product transaction before obtaining the consumer's billing information; (2) obtain the consumers' express informed consent to the negative option feature before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction; and/or (3) provide simple mechanisms for a consumer to stop recurring charges for products to the consumer's credit card, debit card, bank account, or other financial account, violates section 4 of ROSCA, 15 U.S.C. § 8403, and therefore also violates a rule promulgated under section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act.

3.    *Violations of EFTA and Regulation E*

Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized" electronic fund transfer from a consumer's account may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." Compl., ¶ 57. Section 903(1) of the EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals." Compl., ¶ 58. Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing

8

signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer." Compl., ¶ 59.  Finally, section 1005.10 of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 5, Supp. I, states that "[t]he authorization process should evidence the consumer's identity and assent to the authorization" and that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." Compl., ¶ 60.

### a.  Count 6: Unauthorized Debiting from Consumers' Accounts

Plaintiff alleges that Defendants debit consumers' bank accounts on a recurring basis without obtaining written authorization signed or authenticated by consumers for preauthorized electronic fund transfers from their accounts, and without providing a copy of written authorization signed or authenticated by the consumer for preauthorized electronic fund transfers from their accounts.  Compl., ¶¶ 61-62.  Accordingly, Defendants are allegedly in violation of Section 907(a) of the EFTA, Section 1005.10(b) of Regulation E, and are also violating the FTC Act by virtue of their EFTA and Regulation E violations, pursuant to section 918(c) of the EFTA.  Compl., ¶¶ 63-64.

### **LEGAL STANDARD**

Section 13(b) of the FTC Act allows a district court to grant the FTC a preliminary injunction "upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b)(2).  "Section 13(b), therefore, 'places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm to obtain a preliminary injunction.'" *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting *FTC v. Warner Commc'ns., Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984)).  "When the FTC seeks an injunction, it need only show that two of these factors are satisfied: (1) that it is likely to succeed on the merits and (2) that the balance of equities weigh in favor of an

injunction." *FTC v. Alliance Document Preparation*, 296 F. Supp. 3d 1197, 1203 (C.D. Cal. 2017) (citing *Affordable Media*, 179 F.3d at 1233).

Section 13(b) of the FTC Act also "gives the federal courts broad authority to fashion appropriate remedies for violations of the Act," including "the authority to grant any ancillary relief necessary to accomplish complete justice." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994) (citations and internal quotation marks omitted). This encompasses equitable powers such as the ordering of restitution, the freezing of assets, and the imposition of a receivership. *Id.*; *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 560 (9th Cir. 1992); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).

### DISCUSSION

In opposing a preliminary injunction in part, Defendants do not challenge the likelihood of success on the merits of the causes of action in the Complaint; rather they focus on narrowing any injunctive relief to: (1) omit certain business operations; (2) unfreeze assets and/or permit for a release of frozen funds for particular expenses; (3) limit the scope to domestic affairs only. *See* Doc. Nos. 41-1, 36.

### A. *Triangle Defendants' Opposition*

Defendants Triangle Media, Jasper Rain, and Phillips (the "Triangle Defendants") seek to narrow the scope of the injunction in two ways. Doc. No. 41-1. First, they request the Court narrow the scope of the Receivership to business operations which are the subject of the lawsuit, thereby allowing Defendants' legal and profitable businesses segregated from the FTC's allegations to continue. *See id.* Second, they request the Court either remove the asset freeze from the injunction or, at a minimum, provide the Defendants' with monthly normal living expenses and attorneys' fees to defend themselves. *See id.*

#### 1. *Narrowed Business Operations*

The Triangle Defendants note that the Receiver identified certain business operations which could be lawful and profitable businesses. Doc. No. 41-1 at 9. The Triangle Defendants contend that these businesses are not only lawful and profitable, but

they are completely separate from the allegations in the Complaint.  *Id.*  Specifically, Triangle Connect, Triangle Fraud Alerts, Triangle Payments, Triangle IQ, Triangle CRM, and Komaxo IVR, involve neither risk free trial continuity tactics nor negative option features.  *Id.*  As such, the Triangle Defendants urge the Court to narrow the scope of any preliminary injunctive relief to omit these lawful and profitable business entities.  *Id.* at 10.  As noted by the FTC, the Triangle Defendants provide no documentation as to these business lines' current or future earnings or current or future business practices.  *See id.*; *see also* Doc. No. 46 at 4.  Phillips declares that he is "unable to provide more comprehensive descriptions or demonstrations of" the lawful and profitable business at this time due to the restriction of access to webpages and files under the TRO.  Doc. No. 41-3 ("Phillips Amend. Decl."), ¶ 10.

The FTC counters that the Receiver determined that although these business lines could "in theory" be lawful and profitable businesses, they could not in this instance be operated profitably.  Doc. No. 46 at 3.  The FTC also contends that Phillips himself conceded this fact when he told the Receiver he planned to shut down Triangle entirely.  *Id.*

After reviewing Phillips' declaration and the Triangle Defendants' opposition to preliminary injunction, the Receiver declared that none of the six listed business components, on their own or together, are lawful and profitable.  Doc. No. 59 ("Receiver Bus. Decl."), ¶ 4.  For example, Triangle Connect depended almost entirely on the Hardwire/Triangle risk free trial/negative option scheme at the heart of this case.  *Id.*, ¶ 8.  The schedule of Triangle Connect's current clientele and active sales programs confirms that nearly all programs were Hardwire or Hardwire-related and only 10 programs were non-Hardwire related.  *Id.*, ¶ 10.  Eight of the non-Hardwire programs involved risk free/negative option programs, which would violate the TRO.  *Id.*  Two of the programs "may not be risk free trials," but these programs brought in less than $28,000 in 2018.  *Id.*  Moreover, the Receiver found "nothing in the documents" reviewed that would support Phillips' claim that Triangle Connect is profitable.  *Id.*, ¶ 11.  Additionally, employees of

Triangle Payments informed the Receiver that "Hardwire is the **only entity** currently using Triangle's payment gateway." *Id.*, ¶ 13 (emphasis in original). Further, Phillips told the Receiver that Triangle spent $2-3 million to develop the payment gateway, but Phillips was recently unsuccessful in selling the gateway for $250,000 and indicated to the Receiver that he had "given up on his efforts to sell the gateway." *Id.*, ¶ 14. Phillips declared that Triangle Payments has a direct agreement with Elavon, which would allow it to "build its own portfolio," but just a few weeks before the TRO, Phillips told Elavon that "we are getting out of the processing business" and would terminate Elavon's account with Triangle Payments. *Id.*, ¶ 15. Similarly, Triangle Fraud Alerts is an extension of Triangle Payments, such that if Triangle Payments cannot operate legally and profitably, neither can Triangle Fraud Alerts. *See id.*, ¶ 17.

With respect to Triangle CRM, the Receiver states that it was sold to Hardwire. *Id.*, ¶ 19. While Triangle CRM had seven customers other than Hardwire, all have either moved to a different CRM or have shut down. *Id.*, ¶ 20. On July 4, 2018, Phillips told the Receiver that Triangle CRM was not cost-effective and had been transferred to Hardwire. *Id.*, ¶ 21. The Receiver also found "no active operations of business under" the name Komaxo IVR, and noted that Phillips had told the Receiver it is an "interactive voice response platform in 'the final launch stage.'" *Id.*, ¶ 22. Finally, the Receiver declares that Triangle IQ "was a name sometimes internally applied to the fraud alerts and chargeback services resold by Triangle and provided by third party vendors." *Id.*, ¶ 23.

Based on the parties' briefing and arguments at the August 9, 2018 hearing, the Court concludes that these business operations will remain in the preliminary injunction.[1]

//

---

[1] At the hearing, the Triangle Defendants requested access to particular software codes. The Court declines to address that argument as it was not raised in opposition to the preliminary injunction and the FTC has not had an opportunity to review the Triangle Defendants' request.

2.    *Asset Freeze*

The Triangle Defendants next contend that the FTC has not demonstrated that there is a likelihood of dissipation of assets, and therefore, any preliminary injunction entered should not include an asset freeze.  Doc. No. 41-1 at 10-14.  The Triangle Defendants contend that less drastic measures can be taken to assure that the funds will not be dissipated.  *Id.* at 14-17.  However, if the Court finds that an asset freeze is warranted, the Triangle Defendants request the Court permit the Triangle Defendants to obtain $25,000 per month for attorneys' fees and costs related to this litigation and that Phillips receive $25,000 per month for personal expenses.  *Id.* at 17-19.

A court's authority to grant injunctive relief under Section 13(b) of the FTC Act includes "all the inherent equitable powers . . . for the proper and complete exercise" of the court's equity jurisdiction.  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982) (quotation and citation omitted).  One such power is the authority to freeze a defendant's assets.  *Id.* at 1113; *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1088-89 (9th Cir. 1985).  An asset freeze may only be ordered when necessary to preserve the efficacy of other forms of equitable relief.  *H.N. Singer*, 668 F.2d at 1112 ("[T]he authority to free assets by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy."); *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982) ("In the exercise of this inherent equitable jurisdiction the district court may order temporary, ancillary relief preventing dissipation of assets or funds that may constitute part of the relief eventually ordered in the case.").  Before ordering a defendant's assets frozen, a court must carefully balance the potential benefit to injured consumers against the potential for serious disruption of the defendant's business:

> Freezing assets under certain circumstances . . . might thwart the goal of compensating investors if the freeze were to cause such disruption of [the] defendants' business affairs that they would be financially destroyed.  Thus, the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.

*H.N. Singer*, 668 F.2d at 1113 (quotation and citation omitted); *see also Evans Prods.*, 775 F.2d at 1088-89. "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).

The Court finds that an asset freeze is warranted. The FTC estimates that the amount of money that Defendants' wrongfully gained by their allegedly unlawful and deceptive conduct is roughly $30 million, while Defendants' frozen assets amount to $1.8 million. Doc. No. 46 at 8. As such, it is extremely unlikely that the frozen assets will be adequate to redress consumer injuries, which supports maintaining the asset freeze. *World Patent Mktg.*, No. 17-cv-20848-GAYLES, 2017 WL 3508639, at *16 (S.D. Fla. Aug. 16, 2017).

Moreover, at this stage of the litigation, there is a concern that Defendants will dissipate the assets if not enjoined. First, as the Court lays out in more detail below, the Defendants have the infrastructure and means to move millions of dollars within the United States and offshore. Second, even absent an illicit movement of assets, "Defendants' request to unfreeze assets to pay for legal fees and expenses constitutes a dissipation of assets, as these expenditures would deplete the assets available for consumer redress." *Id.* at *17; *see also Johnson v. Couturier*, 572 F.3d at 1085.

However, the Triangle Defendants argue the Court should modify any asset freeze to allow funds to be released for attorneys' fees and for Phillips' ordinary living expenses. Doc. No. 41-1 at 17. Triangle Media and Jasper Rain assert that they are incapable of representing themselves without counsel and need funds to pay for representation in the instant action. *Id.* at 18. Thus, the Triangle Defendants request the Court provide them a monthly allowance of $25,000 for attorneys' fees and costs related to this litigation. *Id.* Also, Phillips requests $25,000 a month to permit him to pay spousal and child support payments which "could be as much as $18,600 per month," and "$7,000 per month" for normal living expenses, including his monthly mortgage payment. *Id.* at 19.

"The Ninth Circuit recognizes district courts' discretion in civil cases to 'forbid or limit payment of attorney fees out of frozen assets.'" *FTC v. Ideal Fin. Sols., Inc.*, No. 2:13-CV-00143-JAD-GWF, 2014 WL 4541191, at *2 (D. Nev. Sept. 9, 2014) (quoting *Commodity Futures Trading Com'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995). "The likelihood that frozen assets may not cover the claims of victims may not always justify denying an award of attorney's fees; the court should also consider the fact the wrongdoing has not yet been proven. Trial courts should also consider whether a release of living expenses will deplete the assets available for potential victims." *Id.* (citing *Noble Metals Int'l, Inc.*, 67 F.3d at 775; *FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1313-14 (S.D. Fla. 2013).

Here, Defendants' conclusory arguments do not give this Court any legitimate basis to release funds after finding good cause for an asset freeze. The frozen assets are significantly less than the estimated injury to consumers, weighing towards denying the Triangle Defendants' request. Moreover, the Court is hesitant about awarding $25,000 per month for attorneys' fees and $25,000 per month for ordinary living expenses given the lack of documentation of the living and legal expenses.

For example, Phillips requests $25,000 per month for living expenses, which consist of spousal and child support payments in connection with his divorce proceedings, which he "anticipates could be as much as $18,600 per month," and "$7,000 per month" for "other normal living expenses," including his mortgage payment. Doc. No. 41-1 at 19. In support, Phillips attaches a report prepared by a financial and accounting analyst opining that he has $18,622 available for support monthly. *See* Phillips Amend. Decl., Exhibit 1. However, the spousal and child support payment amounts have apparently not been set by the court presiding over Phillips' divorce proceedings. As a result, Phillips may ultimately be required to pay less than his "anticipated" spousal and child support payments. Additionally, Phillips declares that his normal living expenses going forward will be approximately $7,000 per month, but he provides no documentation of these expenses, such as receipts, cancelled checks, invoices

or bills. The Court cannot verify the reasonableness of these expenses without more detailed information. Moreover, as noted by the FTC, the $25,000 per month requested by Phillips amounts to $300,000 per year. *See* Doc. No. 46 at 9. "[T]he size of the request makes plain that it goes beyond satisfying mere necessities and would continue to fund a lifestyle unavailable to nearly all Americans." *IAB Mktg. Assocs., LP*, 972 F. Supp. 2d at 1314 (finding an annual amount of $415,800 unreasonable and unnecessary as a release of funds from an asset freeze for ordinary living expenses).

With respect to attorneys' fees, the Ninth Circuit has repeatedly held that whether to allow payment of attorneys' fees out of frozen assets lies within the district court's discretion. *Noble Metals Int'l, Inc.*, 67 F.3d at 775; *Fed. Sav. & Loan Ins. Corp. v. Ferm*, 909 F.2d 372, 374 (9th Cir. 1990); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). "These decisions recognized the importance of preserving the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another." *Ferm*, 909 F.2d at 374. As such, the Court also declines to release the amount for attorneys' fees requested. Phillips declares that he retained Procopio, Cory, Hargreaves & Savitch LLP ("Procopio") for counsel to assist in the defense of this action and that the three retained attorneys agreed to reduce their rates on this matter. Phillips Amend. Decl., ¶ 7. Based on the reduced rates, Procopio "estimates that it will incur approximately $25,000 per month in fees to defend this matter." *Id.* However, these are estimates and the Court will not advance funds to pay for future services not yet incurred.

In its reply and at the hearing, the FTC indicated it would consider requests for reasonable living expenses and attorneys' fees once it receives adequate financial disclosures. Doc. No. 46 at 9 n.13. In light of this, and despite the fact that the frozen assets fall short of the amount needed to compensate injured consumers, the Court notes that a final judgment on the merits has not yet been reached. Additionally, "[c]orporations and other unincorporated associations must appear in court through an attorney." *In re Am. W. Airlines*, 40 F.3d 1058, 1059 (9th Cir. 1994). For this reason, the

preliminary injunction provides a method for Defendants or their attorneys to request reasonable attorneys' fees and living expenses from the Receiver.

**B.** ***Hardwire's Opposition***

Hardwire does not oppose the issuance of a preliminary injunction with respect to its conduct within the United States; rather it seeks to prevent the Court from issuing an order enjoining its foreign operations. Doc. No. 36. Hardwire makes four arguments: (1) the FTC has not demonstrated a likelihood of success on the merits that Hardwire's foreign conduct is within the scope of the FTC Act; (2) the balance of the equities tips in favor of not enjoining Hardwire's foreign conduct; (3) there is no basis for an asset freeze of foreign assets; and (4) the TRO and any preliminary injunction is unenforceable as to its foreign conduct pursuant to the laws of the British Virgin Islands. *See id.*

*1. Scope of the FTC Act*

Hardwire contends that the FTC lacks subject matter jurisdiction over its foreign conduct because the FTC has not demonstrated a likelihood of success on the merits that Hardwire's foreign conduct is causing, or has a likelihood of causing "reasonably foreseeable injury within the United States," or that its foreign conduct "involves material conduct occurring within the United States." Doc. No. 36 at 18 (quoting 15 U.S.C. § 45(a)(4)(A)). In analyzing this argument, the Court considers Hardwire's conduct on its own and the Defendants' conduct as a common enterprise.

a. Individual Conduct

In its denial of Hardwire's motion to modify the TRO, the Court found that the FTC has demonstrated a likelihood of success on the merits that the FTC Act reached Hardwire's foreign conduct. *See* Doc. No. 31. Hardwire contends that the evidence presented by the FTC and relied upon by the Court is incorrect. *See* Doc. No. 36. Hardwire states that: (1) it does not charge U.S. consumers in foreign currencies; (2) U.S. consumers cannot purchase Hardwire products from foreign websites, in foreign currencies or otherwise; (3) funds from foreign transactions with foreign consumers flow entirely through international channels for the benefit of Hardwire and never flow

through the U.S.; and (4) the list of vendors used by Hardwire that the FTC claims are located in the U.S. have not been shown to be tied to any allegedly unlawful conduct. *See id.*

The FTC's "field of action is foreign as well as interstate commerce." *Eastman Kodak Co. v. FTC*, 7 F.2d 994, 996 (2d Cir. 1925). "The exercise by the United States of its sovereign control over its commerce and the acts of its resident citizens therein is no invasion of the sovereignty of any other country or any attempt to act beyond the territorial jurisdiction of the United States." *Branch v. FTC*, 141 F.2d 31, 35 (7th Cir. 1944). Thus, the FTC Act specifically authorizes the exercise of jurisdiction over some acts done outside the territorial jurisdiction of the United States. *Id.* at 36. To enjoin Hardwire's foreign business operations, the FTC must demonstrate a likelihood of success on the merits that Hardwire's foreign conduct either (1) causes or is likely to cause reasonably foreseeable injury within the United States; or (2) involves material conduct occurring within the United States. 15 U.S.C. § 45(a)(4)(A).

Hardwire asserts that its international operations are "entirely separate and distinct from its U.S. operations." Doc. No. 36 at 19. For example, it states that its foreign websites selling products to foreign consumers are designed, owned, and operated by entities outside of the U.S. and sales to foreign consumers are consummated entirely outside the U.S. *Id.* Hardwire asserts that funds from those foreign sales flow only through international channels to Hardwire, not through the U.S. *Id.* However, Plaintiff contends that Hardwire relies on Triangle Media for "back-office support functions in the United States, including the monitoring of Hardwire's customer service calls from consumers in the United States and abroad." Doc. No. 28 at 14. Moreover, Plaintiff contends that Defendants used United States call centers and payment gateways to charge United States consumers and consumers abroad. *Id.* at 14-15. Even further, Plaintiff contends that Hardwire's online marketing operations, including marketing to consumers in the United States and those abroad, are run through a Florida-based online marketing network. *Id.*

Additionally, the Receiver states that one month before the TRO was entered, Hardwire, through the Los Angeles office of Processing.com, caused nominee merchants to file dozens of foreign merchant account applications to process consumer charges in U.S. dollars. Doc. No. 53 at 4. For example, on May 29, 2018, a Bulgarian citizen applied for a merchant account in a corporate name, Glossyibis EOOD. *Id.* The merchant account application stated an intent to process roughly $100,000.00 U.S. dollars per month, listing rosepetal-skin.com and energetic-health.com as its websites and providing U.S. toll free numbers as contact information for the Bulgarian merchant. *Id.* Both of these websites were registered by Hardwire. *Id.* The Receiver identified another Bulgarian nominee corporation, Wiskerowl EEOD, seeking to process $600,000.00 per year in U.S. dollars, specifying it wanted to receive services in the USA and listing amazingherbaldiet.com as its website with a U.S. toll free number. *Id.* This website was also registered by Hardwire. *Id.* As noted by the Receiver, "the use of a Los Angeles company to file Bulgarian merchant applications to process in U.S. dollars, while at the same time filing numerous other applications on behalf of Hardwire seeking to process in euros and pounds, demonstrates that Hardwire's operation was not run as separate U.S. and international operations, but instead is one unified operation with significant roots in this company." *Id.* at 5.

Based on the declarations and evidence provided by the FTC and the Receiver, it appears that Hardwire's foreign conduct involves material conduct (i.e., call centers, payment gateways, and marketing operations with respect to both U.S. and foreign consumers) within the United States. *See* 15 U.S.C. § 45(a)(4)(A). As such, the Court finds that the declarations and evidence, as it currently stands, show a likelihood that Hardwire's foreign conduct involves material conduct occurring within the United States

and is also reasonably likely to cause or has caused reasonably foreseeable injury in the United States.[2]

### b. Common Enterprise

In further support of the applicability of the FTC Act to Hardwire's foreign conduct, the Court finds that the FTC has shown a likelihood in success of proving on the merits that Defendants acted as a common enterprise. "The general rule is that, absent highly unusual circumstances, the corporate entity will not be disregarded." *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 266 (6th Cir. 1970). However, "where the public interest is involved, as it is in the enforcement of Section 5 of the [FTC Act], a strict adherence to common law principles is not required . . . where strict adherence would enable the corporate device to be used to circumvent the policy of the statute." *Id.* at 267 (making this statement in the context of determining whether a parent should be held liable for the acts of the subsidiary). "Thus, in situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with 'a clear mechanism for avoiding the terms of the order,' courts have been willing to find the existence of a common enterprise." *FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (quoting *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming an FTC order holding a company liable because it was part of a "maze of interrelated companies" through which "the same individuals were transacting an integrated business")). As a result, when corporations act as a common enterprise, each may be liable for the deceptive acts and practices of the other. *Commodity Futures Trading Comm'n. v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003) (citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000)).

---

[2] The Court's prior order denying Hardwire's motion to modify the TRO provides additional reasoning supporting this finding. *See* Doc. No. 31.

"[T]he pattern and frame-work of the whole enterprise must be taken into consideration" when determining whether a common enterprise exists. *Delaware Watch Co.*, 332 F.2d at 746 (internal quotation marks and citations omitted). Some of the factors evaluated by Courts to determine whether a common enterprise exists include: (1) common control and ownership; (2) the pooling of resources and staff; (3) whether the companies shared phone numbers, employees, and email systems; (4) whether business is transacted through a maze of interrelated companies; (5) the commingling of corporate funds and failure to maintain separation of companies; (6) unified advertising; (7) whether the companies jointly participated in a 'common venture' in which they benefited from a shared business scheme or referred customers to one another; and (8) evidence that reveals no real distinction exists between the corporate defendants. *Nat'l Urological Group, Inc.*, 645 F.2d at 1167; *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012).

Here, with respect to common control and ownership, the Receiver explains that Phillips and Devin Keer have been in the risk free trial offer business for a decade. Doc. No. 30 at 16. Phillips confirmed with the Receiver that he and Keer began working together in 2008 by setting up an entity in McKinney, Texas, which was ultimately shut down when it "ran afoul of the BBB." *Id.* Keer's role was the "mastermind, marketer, and businessman, while Phillips' primary role was to obtain and maintain merchant accounts in the United States." *Id.* Phillips and Keer established, commonly owned, and ran several companies, including Triangle Media and Hardwire. *Id.* The Receiver also identified a third person, Brett Bond, who is reportedly very close with Keer and Phillips and plays a management role at, and possibly has an ownership interest in, Hardwire. *Id.* Bond "has held himself out as Hardwire's general manager and Triangle's COO." *Id.* at 17.

In the Fall of 2017, Triangle and Hardwire made structural changes so that the two companies have been vendor and client. *Id.* However, a September 25, 2017 email from

Keer to Triangle employees indicates no change. *Id.* Keer wrote that the "change in corporate structure . . . really is mostly a formality." *Id.* Keer reports that through his entity Mantra Media Capital BVI ("Mantra Media"), which is also the parent of Hardwire, he sold his 50% interest in Triangle for $1,000,000. *Id.* However, the Receiver located a contemporaneous Consultancy Agreement between Phillips and Mantra Media, wherein Mantra Media engaged Phillips to consult on e-commerce matters for a two-part consultancy fee—a $1,000,000 engagement fee and a $1,000,000 service fee payable to Phillips at $50,000 per month for 20 months. *See* Doc. Nos. 26-3 at 29-34; 30-16. The Receiver explains that "Keer appears, therefore, to have transferred his interest in Triangle to Phillips for no consideration and Phillips remains on the payroll at $50,000 per month for 20 months." Doc. No. 30 at 18. Hardwire disputes the validity of this consultancy agreement for purposes of making a common enterprise determination, by noting that the Receiver's copy is not signed by Keer. Doc. No. 36 at 15.

Phillips states that he has not had ownership interest in Hardwire since 2014. Doc. No. 30 at 18. In 2014, Phillips and Keer sold Hardwire to a publicly traded company, Electronic Cigarettes International Group, Ltd. ("ECIGS"). *Id.* at 18 n.11. ECIGS paid $5 million, granted stock options to Keer and Phillips, and entered employment contracts with them. *Id.* The deal terms required that the "Seller Parties" "cause[] all the assets owned by Global Northern Trading Ltd to be transferred" to Hardwire prior to the sale to ECIGS. *Id.* Accordingly, Hardwire and Global Northern "apparently had common ownership" prior to the 2014 sale. *Id.* In 2016, ECIGS sold the assets back to Hardwire "for a much reduced purchase price, the relinquishment of the stock options by . . . Keer and Phillips, and the termination of their employment contracts." *Id.* Phillips contends he was not involved in the buyback. *Id.* The Receiver has doubts that Phillips has no ownership interest in Hardwire. *Id.* at 18. In support, the Receiver notes that Phillips' "wife asserts in pleadings that [Phillips] did have an interest in Hardwire up until last year and only attempted to transfer complete ownership to . . . Keer in the summer of

2017, when divorce was imminent . . . ." *Id.* Keer also declares that Phillips had no ownership interest or decision-making authority over Hardwire since December 1, 2013. *Id.* However, the Receiver obtained a Distribution Agreement, dated October 5, 2016, between Hardwire and Abran Limited, wherein Phillips executed the agreement on behalf of Hardwire as its COO. *Id.*; Doc. No. 30-18. Mr. Bond signed on behalf of Abran Limited. Doc. No. 30 at 18-19.

With respect to common operation, the Receiver explained that the companies "appear to be separate on paper, but the flow of funds, behavior, strategy decisions, and fluidity of the companies' tell another story." Doc. No. 30 at 20. The enterprise purportedly works as follows: U.S. consumers order from Global Northern via US nominee[3] companies, are invoiced by the US nominee, and make payment to the US nominee company; the US nominee companies remit receipts to Triangle Media for consolidation, and then Triangle sends the receipts to Global Northern which sends them to Hardwire; non-US consumers paid a nominee, who sent the money directly to Hardwire. *Id.* at 19. Thus, the funds deposited in nominee bank accounts moved around the world, but remained in the Receivership Entities' control. *Id.* at 20. Until September of 2017, consumer funds deposited to the nominee bank accounts were periodically transferred to Triangle's Wells Fargo account. *Id.* Triangle then transferred, roughly twice a month, the balance of the account to the Canadian bank account of Global Northern, which is an entity ultimately controlled by Keer through intermediate entities. *Id.* Global Northern paid for fulfillment and other product-related expenses and then sent the remaining money to the Hardwire bank account in Hong Kong. *Id.* Hardwire then routed funds back to Triangle to cover Triangle's expenses. *Id.* The Receiver is unclear

---

[3] The Receiver states that Defendants' scheme is dependent upon their access to merchant accounts through which consumer charges can be processed. Doc. No. 30 at 4. Because banks will not approve merchant accounts for negative option sales, "Defendants have built a network of merchant accounts by forming shell companies and convincing ordinary people, for a minimum of $500 per month, to act as the "front" (aka "signer" or "nominee") for the shell company and a merchant account in its name. *Id.*

about the operations following September 2017, partly due to Hardwire's refusal to cooperate with the TRO. *Id.* at 21. Phillips explains that transfers from nominee bank accounts are now transferred to a Global Northern bank account in the United States, but the Receiver states that this has not been confirmed and is inconsistent with other evidence. *Id.*

It also appears that the companies share officers and employees. The Receiver notes that Phillips, Keer, and possibly Bond had an ownership interest in the Corporate Defendants and management roles spanning across the companies. *Id.* For example, Phillips acted as CEO of Triangle and in October 2016, he signed a binding contract on behalf of Hardwire as its COO. *Id.* As indicated previously, it also appears that Phillips is presently being paid $50,000 per month by Mantra Media (the parent of Hardwire). *Id.* Hardwire's general manager, Bond, was stationed in Triangle's San Diego office as COO for most of 2017, and in March 2018 Bond was apparently acting for both companies. *Id.* Keer purportedly uses both Hardwire and Triangle email addresses interchangeably. *Id.* The pooling of employees is also apparent. For example, Steven Sproules is a Hardwire employee based in Bangkok, but also acted in an operations role for Global Northern; Juliana Lashley had nominee merchant supervision roles at Hardwire and accounting/banking roles at Global Northern. *Id.*

When the operations of the Defendant companies are considered as a whole, it appears that they function as a common enterprise. All were controlled by the same primary parties, shared employees and resources, commingled corporate funds, and appear to transact business through a maze of interrelated companies. *See Nat'l Utological Group, Inc.*, 645 F.2d at 1167; *Network Servs. Depot, Inc.*, 617 F.3d at 1143; *John Beck Amazing Profits, LLC*, 865 F. Supp. 2d at 1082. Most importantly, if one of these companies escaped liability, it would likely afford the other Defendant companies a means for continuing their operations. The few distinctions between the companies—the fact that they maintained separate bank accounts, for instance—are superficial in nature in comparison to the overwhelming evidence of the companies' interrelated functions.

Accordingly, this serves as an additional basis for finding that the FTC is likely to succeed on the merits of its claim that it has jurisdiction over the operation of all Defendants, both foreign and domestic, because much of this establishes that material conduct occurs within the United States and causes or is likely to cause reasonably foreseeable injury within the United States.

### 2. *Balance of the Equities and Public Interest*

Second, Hardwire contends that the public interest that the FTC seeks to protect is not served by enjoining Hardwire's international conduct. Doc. No. 36 at 20. Here, the stated public interest is to protect consumers from Defendants' risk free trial continuity programs by prohibiting misrepresentations and requiring clear and conspicuous affirmative disclosures as to any sales with a negative option feature. Doc. No. 11 at 8-12. The Court has already determined that the FTC has a likelihood of success on the merits in proving Hardwire's international conduct causes or is likely to cause reasonably foreseeable injury within the United States, and that there is material conduct within the United States. Accordingly, the public interest is served by preliminarily enjoining Hardwire's foreign conduct by protecting consumers from Hardwire's allegedly unlawful and deceptive conduct.

### 3. *Asset Freeze of Foreign Assets*

Hardwire also contends that there is no basis for a freeze of foreign assets or receivership oversight over Hardwire's foreign operations. Doc. No. 36 at 21-23. In support, Hardwire asserts that such a freeze would "be a commercial death sentence." *Id.* at 22. In this Circuit, "when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *World Wide Factors, Ltd.*, 882 F.2d at 347. "Obviously, the public interest in preserving the illicit proceeds . . . for restitution to victims is great." *Affordable Media*, 179 F.3d at 1236. As discussed in the Court's analysis regarding common enterprise, the funds obtained from the allegedly unlawful and deceptive acts of Defendants were often transferred from nominee bank accounts to Triangle's Wells Fargo bank account, then to a Global

Northern bank account in Canada, then to Hardwire's bank account in Hong Kong, and then back to Triangle. In light of the frequent movement of funds throughout the world, it is in the public's interest to freeze Hardwire's foreign assets. *See id.* As discussed previously, the fact that the FTC indicates that Hardwire's frozen assets are valued at approximately $1.8 million and the identified amount of U.S. consumer harm is nearly $30 million further strengthens the public interest in freezing Hardwire's foreign assets. In addition to the public's interest in maintaining restitution funds, the public has a compelling interest in ensuring the robust enforcement of federal consumer protection laws, and that interest would be harmed if Hardwire were permitted to continue operations. *Alliance Document Preparation*, 296 F. Supp. 3d at 1212. As such, the Court finds an asset freeze of Hardwire's foreign assets appropriate.

### 4. *Enforceability of Injunctive Relief*

Finally, Hardwire argues that any preliminary injunction entered against Hardwire's international business is "legally ineffective and without any force" in the British Virgin Islands, where Hardwire is incorporated and has its principal place of business. Doc. No. 36 at 23. In doing so, Hardwire raises two arguments: (1) the Court lacks personal jurisdiction over Hardwire;[4] and (2) the Court cannot enforce any injunctive relief as to Hardwire's foreign conduct because it is unenforceable under the laws of the British Virgin Islands.

#### a. Personal Jurisdiction

Hardwire contends the Court lacks personal jurisdiction over only its foreign conduct. Doc. No. 36 at 25-26. The FTC contends that it has established specific personal jurisdiction over Hardwire. Doc. No. 47 at 7-8.

---

[4] At the hearing, Hardwire argued it is not raising a personal jurisdiction argument, but, as will be discussed below, the case Hardwire relies upon requires a finding of personal jurisdiction before determining enforceability of an injunction.

A defendant is subject to specific personal jurisdiction where sufficient contacts with the forum state exist such that the assertion of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Ninth Circuit has established a three-pronged test for analyzing specific personal jurisdiction:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The plaintiff bears the burden of proving the first two prongs and then the defendant must show that the court's exercise of jurisdiction would be unreasonable. *Id.*

Section 13(b) of the FTC Act provides for worldwide service of process, stating "in any suit under this section, process may be served on any person, partnership, or corporation wherever it may be found." 15 U.S.C. § 53(b)(2). When a federal statute contains a nationwide or worldwide service of process provision, federal due process demands that the defendant's minimum contacts with the United States as a whole, not the forum in particular, justify the exercise of personal jurisdiction. *See Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir. 1985). As such, "the inquiry to determine 'minimum contacts' is . . . 'whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country.'" *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (quoting *Vigman*, 764 F.2d at 1316).

Here, the Court has already found that Hardwire's foreign conduct involves material conduct occurring within the United States via its operation of call centers,

payment gateways, and marketing operations which allegedly service both U.S. consumers and foreign consumers, and also is reasonably likely to cause reasonably foreseeable injury in this country. *See* Doc. No. 28 at 14-15; Doc. No. 31 at 3-4. As such, the Court finds that Hardwire has sufficient minimum contacts with the United States. The FTC's claims are also sufficiently related to these contacts, because they represent material conduct within the United States giving rise to the alleged violations of the FTC Act, ROSCA, and the EFTA. *See* Compl. Thus, the minimum contacts analysis is met.

When minimum contacts have been established, the defendant "must present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (emphasis added). The exercise of specific personal jurisdiction is reasonable unless it offends traditional notions of fair play and substantial justice. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002). Here, exercising personal jurisdiction over Hardwire's foreign conduct would not offend traditional notions of fair play and substantial justice. Hardwire does not oppose a preliminary injunction with respect to its conduct within the United States. Accordingly, Hardwire will defend this action in this district already with respect to its domestic conduct. Moreover, Hardwire has not provided a compelling reason that a finding of personal jurisdiction would be unreasonable. As will be discussed below, Hardwire argues that any order would be unenforceable in the British Virgin Islands, but the case law relied upon by Hardwire does not support its contention. Accordingly, the Court should find that it has personal jurisdiction over Hardwire.

           b.    Enforceability

Hardwire contends that the district court does not have the judicial authority to enforce a preliminary injunction with respect to its foreign conduct. Hardwire relies heavily upon one case in particular, *Reebok Int'l v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995), for its contention that the TRO, and any future injunctive relief, is unenforceable

as to Hardwire's foreign conduct because it is unenforceable according to the laws of the British Virgin Islands. Hardwire asserts that *Reebok* holds that "[w]here a temporary restraining order issued by a federal district court is not recognized or enforceable under the laws of a foreign nation, the district court has no authority to enforce its terms against a *party* who resides in that foreign nation." Doc. No. 36 at 24 (emphasis added). Hardwire asserts that the Ninth Circuit "concluded that a foreign entity could not be held in contempt for refusing to comply with a temporary restraining order issued by the [district court] because the temporary restraining order had no effect in that foreign entity's country of operations." *Id.*

The holding in *Reebok* is not as broad as Hardwire suggests. In *Reebok*, the Ninth Circuit concluded that district courts lack specific personal jurisdiction to order foreign *non-party* banks with no contact in the United States to comply with an asset freeze injunction. *Reebok, Int'l*, 49 F.3d at 1389, 1392. Thus, a foreign *non-party* could not be held in contempt for noncompliance with a TRO because the district court lacked personal jurisdiction over the *non-party*. *Id.* As a result, *Reebok* is inapposite to this case because Hardwire is a party in this action with contacts in the United States, and because the Court has personal jurisdiction over Hardwire. Once personal jurisdiction over a party is obtained, district courts have authority to issue injunctions, including orders to freeze property under its control, whether within or without the United States. *See United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965). Accordingly, the Court does have the judicial authority to enforce its TRO and the preliminary injunction with respect to Hardwire's foreign conduct.

//
//
//
//
//
//

*C.* **_Conclusion_**

For the foregoing reasons, the Court finds a preliminary injunction and continued asset freeze appropriate. The Court also finds it appropriate to appoint the temporary receiver as the permanent receiver in this action. Accordingly, the Court **GRANTS IN PART** the FTC's request for a preliminary injunction, which is issued this date in a separate document entitled "Preliminary Injunction."

**IT IS SO ORDERED**.

Dated: August 24, 2018

Hon. Michael M. Anello
United States District Judge

18cv1388-MMA (NLS)